627 So.2d 1210 (1993)
STATE of Florida, DEPARTMENT OF HEALTH AND REHABILITATIVE SERVICES, Appellant,
v.
James W. COX and Rodney M. Jackman, Appellees.
No. 93-01138.
District Court of Appeal of Florida, Second District.
December 1, 1993.
*1211 Anthony N. DeLuccia, Jr., Dist. Legal Counsel, Dept. of Health and Rehabilitative Services, Fort Myers, and Linda K. Harris, Deputy Gen. Counsel, Dept. of Health and Rehabilitative Services, Tallahassee, for appellant.
Nina E. Vinik, American Civ. Liberties Union Foundation of Florida, Miami, and Doris A. Bunnell, Bradenton, for appellees.
En Banc.
ALTENBERND, Judge.
The plaintiffs, Mr. Cox and Mr. Jackman, voluntarily disclosed to HRS that they are homosexual. Each has been denied the opportunity to apply to adopt a child because section 63.042(3), Florida Statutes (1991), prohibits adoptions by homosexuals. At *1212 summary judgment, they convinced the trial court that this statute is unconstitutional for several reasons. We reverse because the plaintiffs failed to establish that the legislature lacked the constitutional power to make this public policy decision. The debate over the nature of homosexuality and the wisdom of the strictures that our society has historically placed upon homosexual activity cannot and should not be resolved today in this court. For purposes of governance, the legislature is the proper forum in which to conduct this debate so long as its decisions are permitted by the state and federal constitutions.

I. PROCEEDINGS IN THE TRIAL COURT
The factual record in this case is very limited. It is undisputed that Mr. Cox attempted to sign up for HRS parenting classes in Sarasota, Florida, on March 22, 1991. At that time, he voluntarily disclosed that he is homosexual. Mr. Jackman took the same steps on April 3, 1991. HRS became aware that the two men lived at the same address and sent them a letter in late April advising them that HRS would not accept an application for the adoption of a child from either man in light of section 63.042(3).[1] That statute, enacted in 1977, provides: "No person eligible to adopt under this statute may adopt if that person is a homosexual." See Ch. 77-140, Laws of Fla.
After receiving the letter, the two men filed this action to declare section 63.042(3) unconstitutional on its face and as applied to them. They based their complaint on the right of privacy, substantive due process, and equal protection. Both sides filed motions for summary judgment, and the trial court decided to determine the facial validity of the statute based on the above-described facts and any information the parties wished to provide to the court. By stipulation, the parties filed copies of various law review articles and other reports, editorials, and discussions appearing in magazines and journals. Although both Mr. Jackman and Mr. Cox admitted that they are homosexual and claimed no confusion concerning the definition of that term, the trial court asked the parties to brief the potential ambiguity of the undefined statutory word, "homosexual."
The trial court, relying heavily upon an unappealed circuit court opinion in Seebol v. Farie, 16 Fla. L. Weekly C52 (16th Cir.Ct. 1991), 17 Fam.L.Rep. (BNA) 1331 (Mar. 15, 1991),[2] held that section 63.042(3) is void for vagueness and that it violates homosexuals' rights of privacy and equal protection. HRS filed this appeal.[3]

II. A PROBLEM OF METHODOLOGY
Before addressing the constitutional issues, we consider a serious procedural problem arising out of the parties' attempt to resolve these issues on summary judgment. We recognize that the facial constitutionality of a statute is a question to be resolved by the court, and that evidence concerning the facts of a specific case are frequently unnecessary. Department of Revenue v. Florida Home Builders Ass'n, 564 So.2d 173 (Fla. 1st DCA), review denied, 576 So.2d 286 (1990); Sims v. State, 510 So.2d 1045 (Fla. 1st DCA 1987). Depending on the nature of the statute and the basis for the constitutional challenge, however, the issue of facial constitutionality can be a mixed question of fact and law. Glendale Fed. Sav. & Loan Ass'n v. State, Dep't of Ins., 485 So.2d 1321 (Fla. 1st DCA), review denied, 494 So.2d 1150 (Fla. 1986). When the constitutional issue is a mixed question of fact and law, the parties need to present evidence. In the absence of prima facie evidence, the party with the burden of proof cannot prevail. We conclude that the constitutional issues raised in this case concerning vagueness and equal protection *1213 are mixed questions of law and fact and that the plaintiffs have failed to present evidence to support the trial court's ruling at this stage of the proceedings.
The trial court's opinion discusses the plaintiffs' "unrebutted and overwhelming evidence" establishing that homosexuals have normal abilities to rear children. In truth, there is virtually no evidence in the record. The parties merely submitted copies of law review articles and other reports in magazines and journals.[4]
There are only two major scientific articles in the record. One is a review of research performed by various people. J. Charlotte Patterson, Children of Lesbian and Gay Parents, Child Dev., Oct. 1992, at 1025. The record contains no information concerning Ms. Patterson's credentials. The review focuses not on adopted children, but on the natural children of homosexuals. It discusses the need for future research and does not render any scientific or legal opinion concerning the best interests of children in need of adoption.
The other major article is a report describing an anonymous survey of only twenty-three homosexual parents and sixteen heterosexual single parents. Mary B. Harris & Parlene J. Turner, Gay and Lesbian Parents, J. Homosexuality, Winter 1985/86, Vol. 12. Apparently, this small sample of homosexual households was located in New Mexico. The article does not focus on children adopted by homosexuals. A professor of "educational foundations" and an associate professor of home economics conducted this survey. There is no information concerning their expertise in this area. The record is also silent on the professional reputation and objectivity of the Journal of Homosexuality.
The parties to this lawsuit suggest that forty-eight states permit adoption by homosexuals. If this is true, the experience in those states might provide relevant evidence concerning these constitutional questions. Nevertheless, the record contains little, if any, information about children adopted in other states.
Although The Atlantic Monthly has not been recognized as an authoritative source on these issues, the plaintiffs filed a copy of a noteworthy article from that magazine. Chandler Burr, Homosexuality and Biology, The Atlantic Monthly, Mar. 1993, at 47. The article claims that the "issue of homosexuality has arrived at the forefront of America's political consciousness." It notes that biology, as a scientific discipline, has begun to ask fundamental questions about the nature and causes of homosexuality. However, the article maintains that biology has only begun to provide "glimmers of answers." Id. at 47. After a lengthy discussion describing the preliminary nature of this research, the article observes: "[I]t would be wise to acknowledge that science can be a rickety platform on which to erect an edifice of rights." Id. at 65.
The parties have not established that the materials in this record are the type of information that a trial court may accept through judicial notice. See § 90.202(11), (12), Fla. Stat. (1991). No showing was made that these articles would be the type of data reasonably relied upon by experts on these subjects and no expert witnesses were called to discuss or explain these reports. See § 90.704, Fla. Stat. (1991). Neither the trial court nor this court has the training and expertise necessary to evaluate and apply the scientific studies in the record.
Although "trial by photocopy" may have been less costly to the parties, the issues before the court involve the constitutionality of a statute enacted by a majority vote in both houses of the legislature and signed into law by the Governor. These issues are important to the people of this state. The parties could not use this procedure simply to overlook or ignore unproven and disputed issues of fact. The trial court did not have a record to support a summary judgment in favor of the plaintiffs on any issue. Accordingly, we must reverse this summary judgment.

III. THE QUESTION OF VAGUENESS: HOMOSEXUAL ORIENTATION V. HOMOSEXUAL ACTIVITY
Section 63.042(3) does not define "homosexual." Despite the fact that the *1214 statute has been in effect since 1977, there are no reported cases in which a litigant has ever alleged that the term "homosexual" in section 63.042(3) is unconstitutionally vague. We have not been provided with any legislative history suggesting that anyone has ever attempted to amend this statute because of any perceived ambiguity. Mr. Cox and Mr. Jackman have admitted that they are homosexual and have never alleged that they found the term to be unconstitutionally vague. Thus, we are troubled by the trial court's unilateral amendment of the plaintiffs' complaint to add a constitutional due process theory that the parties had not chosen to litigate. The plaintiffs have not established that this statute is unconstitutionally vague.
The only other state that has enacted a similar statute is New Hampshire. See N.H. Rev. Stat. Ann. § 170-B:4 (1991). That statute has withstood constitutional scrutiny. See Op. of the Justices, 530 A.2d 21 (N.H. 1987). The New Hampshire statute defines "homosexual" as "any person who performs or submits to any sexual act involving the sex organs of one person and the mouth or anus of another person of the same gender." N.H. Rev. Stat. Ann. § 170-B:2 (1991). In upholding its statute, the New Hampshire Supreme Court limited its definition to persons voluntarily engaging in homosexual activity reasonably close in time to the filing of the adoption application. Op. of the Justices, 530 A.2d at 294-295.
HRS argues that the Florida statute can be reasonably interpreted to include the same concepts as those employed in the New Hampshire definition. HRS does not claim that the statute applies to persons who merely have some degree of homosexual orientation or to people who have experimented with homosexual activity in the past. HRS does not intend to bar adoption based on homosexual orientation, but only when it knows of current, voluntary homosexual activity by an applicant.[5]
The legislature need not define every word in a statute to survive a vagueness challenge. It is merely necessary for the legislature to give adequate notice of what conduct is prohibited by the statute and to provide clarity sufficient to avoid arbitrary and discriminatory enforcement. Southeastern Fisheries Ass'n v. Department of Natural Resources, 453 So.2d 1351 (Fla. 1984). This analysis is performed from the perspective of a person of common understanding and intelligence. Schultz v. State, 361 So.2d 416 (Fla. 1978). This standard is less stringent when the statute is not a criminal statute. Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc., 455 U.S. 489, 102 S.Ct. 1186, 71 L.Ed.2d 362 (1982); D'Alemberte v. Anderson, 349 So.2d 164 (Fla. 1977); State v. Wershow, 343 So.2d 605 (Fla. 1977); Florida Businessmen for Free Enter. v. City of Hollywood, 673 F.2d 1213 (11th Cir.1982).
If possible, this court must construe section 63.042(3) in a manner that upholds the statute. Corn v. State, 332 So.2d 4 (Fla. 1976). A reasonable construction of a statute by an agency charged with its administration is entitled to great weight. Department of Ins. v. Southeast Volusia Hosp. Dist., 438 So.2d 815 (Fla. 1983), appeal dismissed, 466 U.S. 901, 104 S.Ct. 1673, 80 L.Ed.2d 149 (1984). We conclude that HRS has reasonably construed the statute to apply only to applicants who are known to engage in current, voluntary homosexual activity. We conclude that an ordinary person would realize that the legislature had not created a rule concerning a person's thoughts, but rather a person's conduct.[6] On the basis of this record, we cannot hold that the legislature was required to use precise anatomical language in order for a person of common understanding *1215 and intelligence to appreciate that the homosexual activity intended by the Florida statute is the same as that described in the New Hampshire statute.
Our interpretation of this undefined term is comparable to the supreme court's efforts to provide a workable interpretation of the term "professional" in a statute of limitations. Pierce v. AALL Ins. Inc., 531 So.2d 84 (Fla. 1988); Garden v. Frier, 602 So.2d 1273 (Fla. 1992). Section 95.11(4)(a), Florida Statutes (1983), provided a shortened statute of limitations for claims against professionals, but did not provide a statutory definition of "professional." In light of the obligation to provide a construction that upholds the statute, the supreme court provided a judicial definition that limited the term, "professional," to vocations requiring a college education as a requirement for a license. If anything, the definition of homosexuality that we employ in this case requires less judicial construction of the statute than was required in Pierce and Garden.
We recognize that a definition of "homosexual," limited to applicants who are known to engage in current, voluntary homosexual activity, draws a distinction between homosexual orientation and homosexual activity. We understand that some people have concluded that it is unreasonable or unfair to distinguish homosexual orientation from homosexual activity. They believe that the activity is nothing more than an inevitable expression of the orientation. They believe that both homosexual orientation and activity are caused by biological or environmental factors beyond the control of the individual. In their opinion, homosexual conduct is not a voluntarily chosen lifestyle. From this perspective, a rule which discriminates against the activity is no different than a rule which discriminates against the orientation.
In contrast, other people maintain that homosexual activity is severable from homosexual thought. They believe that homosexual conduct should be regulated by the state. As a result, some types of homosexual conduct have long been the subject of criminal statutes. See § 800.02, Fla. Stat. (1991). The United States Supreme Court has held that statutes regulating homosexual sodomy do not violate federal due process. Bowers v. Hardwick, 478 U.S. 186, 106 S.Ct. 2841, 92 L.Ed.2d 140 (1986).
At this time, the orientation/activity question is simply a matter upon which reasonable persons can and do disagree  as a matter of scientific fact and as a matter of moral, religious, and legal opinion. Certainly, the record presented to the trial court and to this court does not end the debate. Under these circumstances, the legislature is constitutionally permitted to reach its own conclusions on the validity of the distinction between homosexual orientation and activity without any mandate from this court.

IV. THE RIGHT OF PRIVACY
The trial court determined that section 63.042(3) violates the Florida constitutional right of privacy under article I, section 23. In so doing, it was strongly influenced by the earlier trial court decision in Seebol. Both decisions focus on a perceived right of privacy concerning sexual orientation. Neither decision evaluates the statute if the definition of "homosexual" is limited to current voluntary sexual conduct. In our opinion, neither decision gives sufficient consideration to the fact that the statute does not establish a governmental intrusion into a person's private life; it bars the statutory privilege to adopt a child when it is known that the applicant is homosexual. We reverse this holding in the summary judgment and rule that HRS is entitled to summary judgment on these issues.
These plaintiffs presented a narrow privacy issue. Mr. Cox and Mr. Jackman voluntarily admitted that they are homosexual. They cannot claim an expectation of privacy concerning a fact that they have willingly disclosed. Moreover, they do not object to revealing their homosexuality on an adoption application. Further, they agree that HRS may make this inquiry. They simply believe that Florida should treat information concerning their current sexual activity as one of the many factors involved in the decision to approve an application. They argue that many other states take this approach.
*1216 Article I, Section 23, of the Florida Constitution states: "Every natural person has the right to be let alone and free from governmental intrusion into his [or her] private life except as otherwise provided herein." The right to privacy is a fundamental right. Winfield v. Division of Pari-Mutuel Wagering, Dep't of Bus. Reg., 477 So.2d 544 (Fla. 1985); In re T.W., 551 So.2d 1186 (Fla. 1989); In re Browning, 568 So.2d 4 (Fla. 1990). When this right applies, governmental intrusion must serve a compelling state interest. Winfield, 477 So.2d 544.
Although the boundaries of the right to privacy are still evolving in the courts, the right has been applied: (1) to protect natural persons from public disclosure of personal matters by the government; (2) to prohibit unwarranted governmental inquiry concerning private matters; and (3) to create a zone of autonomy protecting personal decisionmaking, especially concerning issues of health. See In re T.W., 551 So.2d at 1192. On its face, section 63.042(3) does not implicate these concerns.
Section 63.042(3) denies one group of natural persons the opportunity to adopt based upon their known sexual activities. It does not require public disclosure of personal matters. Indeed, chapter 63 makes the files and the proceedings concerning adoptions confidential. § 63.162, Fla. Stat. (1991).
This statute does not compel unwarranted inquiry concerning private matters. In fact, this statute does not mandate any specific inquiry concerning an applicant's background.[7] In this case, the state did not demand secret information; the plaintiffs voluntarily provided the information. "[B]efore the right of privacy is attached and the delineated standard applied, a reasonable expectation of privacy must exist." Winfield, 477 So.2d at 547.
Moreover, adoption is simply not a private matter. As the trial court recognized, adoption is not a right; it is a statutory privilege. Hamilton v. Beard, 490 So.2d 1297 (Fla. 2d DCA 1986); 2 C.J.S. Adoption of Persons § 3 (1972). Thus, adopting a child is not the same as choosing to have a natural family. Cf. Smith v. Organization of Foster Families for Equality & Reform, 431 U.S. 816, 97 S.Ct. 2094, 53 L.Ed.2d 14 (1977) (drawing a distinction between foster families and natural parents). We recognize that certain fundamental constitutional rights are involved in an established parent/child relationship. Santosky v. Kramer, 455 U.S. 745, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982); Meyer v. Nebraska, 262 U.S. 390, 43 S.Ct. 625, 67 L.Ed. 1042 (1923). A person who asks the state for the privilege to adopt does not have a fundamental right arising from an existing family relationship. Instead, the applicant asks the state to make a decision in the best interests of a child in need of adoption.
To make decisions that accord with the best interests of children, government agencies and courts are clearly entitled to conduct extensive examinations into the background of prospective parents. These plaintiffs have not argued that such investigations violate the right of privacy. Even if the right of privacy had been invoked concerning such an investigation, it is clear that the best interests of a child can create a very substantial state interest. See Department of Health & Rehabilitative Servs. v. Privette, 617 So.2d 305 (Fla. 1993).
This statute does not necessarily intrude into any protected zone of autonomy concerning personal decisionmaking. As explained above, the decision to adopt a child in Florida is not a private decision. Even assuming that the decision to engage in homosexual activity were within a zone of autonomy, this statute does not directly interfere with that decision. It does not limit anyone's private sexual life; it limits one's ability to adopt a child in Florida if the state knows that the person is homosexual. Many private decisions indirectly limit one's ability to obtain statutory privileges. Such indirect limitations do not render statutory privileges unconstitutional under the right of privacy.
*1217 The standard HRS form for application to adopt a child asks whether the applicant is homosexual or bisexual. See HRS-CYF Form 5071, Adoption, Paternity and other Florida Family Practice, § 2.26 (2d ed. 1992). The plaintiffs argue that the application for admission to the bar contains many personal questions, and that the practice of law is a privilege somewhat similar to the opportunity to adopt. They observe that the supreme court has analyzed mental health questions on the application for admission to the bar under the right of privacy, using a compelling state interest test. Florida Bd. of Bar Examiners re: Applicant, 443 So.2d 71 (Fla. 1983). They suggest that the same compelling state interest test should be used in this case.
We decline to decide whether the HRS application should be so analyzed. In this case, we have no controversy concerning the contents of the application form. Likewise, we do not need to determine what steps HRS would be entitled to take in the best interests of children if an applicant declined to answer these questions. See Privette, 617 So.2d 305.

V. DUE PROCESS
The trial court has not directly ruled upon the plaintiffs' substantive due process claim. It did, however, extensively rely upon the decision in Seebol, which expressly held the statute unconstitutional under a substantive due process analysis. Moreover, an analysis of fundamental rights under due process is necessary to determine whether strict scrutiny applies under the right to equal protection. Accordingly, we conclude that a brief consideration of due process is appropriate.
Both the United States Constitution and the Florida Constitution limit the application of due process to deprivations of "life, liberty or property." U.S. Const. amend. XIV; Art I, § 9, Fla. Const. The plaintiffs do not seriously argue that the statutory privilege of adoption invokes an interest in life or in property. They argue that the statute invokes an interest in liberty.
From the usage of "liberty" in everyday language, a person might think that adoption was a "liberty" in a free society. However, for the purpose of explaining due process as a matter of constitutional law, "liberty" must be carefully defined. The courts have been cautious in extending the concept of liberty beyond a person's physical freedom. A broad definition of "liberty" for due process analysis would substantially change the balance of powers between the federal government and those of the states, and between the judicial and legislative branches of government. Accordingly, liberty interests that do not involve physical freedom must be "fundamental liberties" before they are protected by due process. Such liberties must be "implicit in the concept of ordered liberty." Bowers, 478 U.S. at 191, 106 S.Ct. at 2844. They are freedoms "deeply rooted in this Nation's history and tradition." Id. at 192, 106 S.Ct. at 2844.
We agree with the New Hampshire Supreme Court that the opportunity to adopt an unrelated child is not a fundamental liberty. Op. of the Justices, 530 A.2d 21 (N.H. 1987). Similarly, the United States Supreme Court has held that the decision to engage in homosexual activity is not a fundamental right. Bowers, 478 U.S. 186, 106 S.Ct. 2841, 92 L.Ed.2d 140 (1986).
The plaintiffs correctly argue that, under the doctrine of primacy, we are not compelled to interpret Article I, Section 9, of the Florida Constitution as narrowly as the United States Supreme Court has interpreted the Fourteenth Amendment. Traylor v. State, 596 So.2d 957 (Fla. 1992). Accordingly, they suggest that we are not bound by Bowers as a matter of state constitutional law.
The Due Process Clause in the United States Constitution and the similar clauses in the state constitutions, however, have a shared and overlapping history. We conclude that it is not appropriate for this court, as a matter of state constitutional law, to depart from a recent United States Supreme Court ruling under a virtually identical federal constitutional clause unless we are convinced that aspects of Florida's constitution, law, or announced public policies clearly justify such a departure. We have considered Florida's right of privacy under article I, section 23, and the basic rights described in article I, section 2. We are not convinced *1218 that these aspects of the Florida Constitution expand the concept of liberty under article I, section 9, so that homosexuality is a fundamental right. The plaintiffs have not clearly established a valid legal justification for this court to depart from the rule announced in Bowers.

VI. EQUAL PROTECTION
Adopting the analysis in Seebol, the trial court held that section 63.042(3) violates equal protection under either the strict scrutiny or the rational basis standard. We conclude that the plaintiffs have established no right to strict scrutiny and have not established that the statute fails the rational basis test.
"All natural persons are equal before the law... ." Art. I, § 2, Fla. Const. No state "shall deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV. These constitutional rights do not prohibit the legislature from distinguishing among categories of persons in statutes. They do, however, entitle the plaintiffs to a judicial review of section 63.042(3) to assure that the category established in that statute withstands the analysis created by the courts to implement the right to equal protection.
There are two long-established standards applicable to equal protection review: strict scrutiny and rational basis. In recent years, the courts have also begun to recognize a category of intermediate review. See City of Cleburne v. Cleburne Living Center, 473 U.S. 432, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985).[8] Intermediate review has been applied primarily in the context of gender and illegitimacy, as biological conditions beyond the control of the individual. Mississippi University for Women v. Hogan, 458 U.S. 718, 102 S.Ct. 3331, 73 L.Ed.2d 1090 (1982); Lalli v. Lalli, 439 U.S. 259, 99 S.Ct. 518, 58 L.Ed.2d 503 (1978); Cf. Massachusetts Bd. of Retirement v. Murgia, 427 U.S. 307, 96 S.Ct. 2562, 49 L.Ed.2d 520 (1976) (rational basis test applies to age categories). The trial court did not rely upon an intermediate review. The parties have neither argued for such a review nor provided case law from other courts adopting such an approach to homosexual activity. Accordingly, we limit our analysis to the two better-established standards of review. See Heller v. Doe by Doe, ___ U.S. ___, 113 S.Ct. 2637, 125 L.Ed.2d 257 (1993) (declining to consider an equal protection standard not raised in the trial court).
Equal protection analysis requires strict scrutiny by the judiciary only in cases involving fundamental rights or a suspect class. Murgia, 427 U.S. 307, 96 S.Ct. 2562. As discussed in the preceding section, neither the statutory privilege to adopt nor the choice to engage in homosexual activity involves a fundamental right. Thus, strict scrutiny can apply in this case only if homosexual activity creates a suspect classification.
In a recent Colorado case, the court applied a strict scrutiny analysis to bar enforcement of an amendment to the Colorado Constitution that expressly gave no protected status to homosexual orientation. Evans v. Romer, 854 P.2d 1270 (Colo. 1993). That court, however, did not treat homosexuals as a suspect class and noted that prior cases had declined to treat homosexuals as a suspect class. Id. at 1277.
In Florida, the supreme court has ruled that the mere fact that an applicant for membership in the Florida Bar reveals a homosexual orientation, as compared to current homosexual activity, is not a basis for exclusion from membership in the Florida Bar. In so ruling, the court examined its own standards, not those of the legislature, and conducted the examination under the rational basis standard. In re Florida Bd. of Bar *1219 Examiners, 358 So.2d 7 (Fla. 1978). We have located no Florida appellate precedent adopting a strict scrutiny review.
The Kentucky Supreme Court issued a lengthy opinion in 1992 which held the state's sodomy statute unconstitutional under the state's constitution. Commonwealth v. Wasson, 842 S.W.2d 487 (Ky. 1992). The majority declined to distinguish between homosexual orientation and homosexual activity. There is language in that opinion suggesting that homosexuality is a suspect class, but the critical analysis seems to apply a rational basis test.
In the federal courts, neither homosexual orientation nor homosexual conduct has been determined to be a class requiring strict scrutiny review. Ben-Shalom v. Marsh, 881 F.2d 454 (7th Cir.1989), cert. denied, 494 U.S. 1004, 110 S.Ct. 1296, 108 L.Ed.2d 473 (1990); High Tech Gays v. Defense Industrial Security Clearance Office, 895 F.2d 563 (9th Cir.1990); Pruitt v. Cheney, 963 F.2d 1160 (9th Cir.1991), cert. denied, ___ U.S. ___, 113 S.Ct. 655, 121 L.Ed.2d 581 (1992).[9] We conclude that the plaintiffs have not established a basis for strict scrutiny review in this case.
Under the rational basis test, the trial court decided that not every homosexual applicant would be an unacceptable adoptive parent. It believed that the legislature could not exclude homosexuals as a group if some members of that class could be good parents. The trial court was impressed by the articles indicating that homosexuals who have children from prior marriages tend to be good parents. The trial court recognized the presumption of constitutionality that exists under the rational basis test, but concluded that the plaintiffs had overcome this presumption with "objective evidence."
We conclude that the trial court overestimated the power of the judiciary under the rational basis test. This test is intended to permit the legislature to make most public policy decisions without interference from the courts. "This inquiry employs a relatively relaxed standard reflecting the Court's awareness that the drawing of lines that create distinctions is peculiarly a legislative task and an unavoidable one." Murgia, 427 U.S. at 313, 96 S.Ct. at 2567. "[L]egislative classifications are valid unless they bear no rational relationship to the State's objectives." Washington v. Confederated Bands & Tribes of the Yakima Indian Nation, 439 U.S. 463, 501, 99 S.Ct. 740, 762, 58 L.Ed.2d 740 (1979). A classification is not unconstitutional merely because it is imperfect. Dandrige v. Williams, 397 U.S. 471, 90 S.Ct. 1153, 25 L.Ed.2d 491 (1970). "Put another way, a statutory classification such as this should not be overturned `unless the varying treatment of different groups or persons is so unrelated to the achievement of any combination of legitimate purposes that we can only conclude that the legislature's actions were irrational.'" Barry v. Barchi, 443 U.S. 55, 67, 99 S.Ct. 2642, 2650, 61 L.Ed.2d 365 (1979) (quoting Vance v. Bradley, 440 U.S. 93, 97, 99 S.Ct. 939, 943, 59 L.Ed.2d 171 (1979)).
We are aware that some courts have recently relied on City of Cleburne to apply an "active" rational basis review in cases involving homosexual categories. See High Tech Gays, 895 F.2d 563; Pruitt, 963 F.2d 1160. Under the "active" test, the courts seem to have placed an evidentiary burden on the state to prove a rational basis for a policy that treats homosexuals differently. High Tech Gays, 895 F.2d at 575.
The Supreme Court, however, has recently reemphasized the narrowness of rational basis review. Heller, ___ U.S. ___, 113 S.Ct. 2637. Under rational basis review, a statute is presumed to be constitutional. Until the presumption is overcome, the state has no burden of persuasion and "no obligation to produce evidence to sustain the rationality of a statutory classification." Id. ___ U.S. at *1220 ___, 113 S.Ct. at 2643. If there is "any reasonably conceivable state of facts that could provide a rational basis for the classification," the courts must defer to the legislature. Id., ___ U.S. at ___, 113 S.Ct. at 2642.
The state clearly has a legitimate governmental purpose in seeking to provide for the best interests of children in need of adoption. Cf. § 63.022(1), Fla. Stat. (1991) ("It is the intent of the legislature to protect and promote the well-being of persons being adopted and their natural and adoptive parents and to provide to all children who can benefit by it a permanent family life... ."). HRS argues that the legislature can rationally decide that this governmental purpose is promoted by a total prohibition of adoptions by homosexuals.
Perhaps the simplest argument in support of this position can be summarized as follows: whatever causes a person to become a homosexual, it is clear that the state cannot know the sexual preferences that a child will exhibit as an adult. Statistically, the state does know that a very high percentage of children available for adoption will develop heterosexual preferences. As a result, those children will need education and guidance after puberty concerning relationships with the opposite sex. In our society, we expect that parents will provide this education to teenagers in the home. These subjects are often very embarrassing for teenagers and some aspects of the education are accomplished by the parents telling stories about their own adolescence and explaining their own experiences with the opposite sex. It is in the best interests of a child if his or her parents can personally relate to the child's problems and assist the child in the difficult transition to heterosexual adulthood. Given that adopted children tend to have some developmental problems arising from adoption or from their experiences prior to adoption, it is perhaps more important for adopted children than other children to have a stable heterosexual household during puberty and the teenage years. Without reliance upon any unsubstantiated notion that a homosexual parent could "teach" a child to become a homosexual, HRS maintains that the legislature may still decide that the best interests of children require that they be adopted by persons who can and will serve as heterosexual role models.[10]
Certainly, there are people in Florida who strongly disagree with this proffered reasoning. Others may believe that this reasoning warrants a denial of most, but not all, adoptions by homosexual applicants. The materials placed in this record by the plaintiffs, however, have not established that this reasoning is irrational nor have they overcome the presumption of constitutionality. Accordingly, the state has not yet had any obligation to provide evidence to support the reasonably conceivable state of facts that supply an initial rational basis for its classification. It may be that the legislature should revisit this issue in light of the research that has taken place in the last fifteen years, but we cannot say that the limited research reflected in this record compels the judiciary to override the legislature's reasoning.[11]
Reversed and remanded.
*1221 FRANK, C.J., and RYDER, DANAHY, CAMPBELL, SCHOONOVER, HALL, THREADGILL, PARKER, PATTERSON and BLUE, JJ., concur.

APPENDIX A
Adoption  Statute prohibiting homosexuals from adopting violates plaintiff's right to privacy under Florida Constitution and rights to equal protection and due process of law under Florida and Federal Constitutions  Inquiry into applicant's sexual orientation and consideration thereof, without regard for child's best interests, violates Florida's right to privacy  Statute not least restrictive means of promoting compelling government interest in protecting best interests of children  Statutory presumption that homosexuals would be unfit parents violates due process rights.
EDWARD SEEBOL, Plaintiff, vs. JOHN FARIE, District Administrator, District Eleven, Florida Department of Health and Rehabilitative Services, Defendants. 16th Judicial Circuit in and for Monroe County, Florida. Case No. 90-923-CA-18. March 15, 1991. M. Ignatius Lester, Judge. Lynn G. Waxman, West Palm Beach, FL, for plaintiff. Morton Laitner, Miami, FL, for defendants.

OPINION
Plaintiff, EDWARD SEEBOL, challenges the unconstitutionality of § 63.042(3), Fla. Stat. (1990), which prohibits homosexuals from adopting. After review of the pleadings and law, the court finds that section 63.042(3) violates Plaintiff's right to privacy under the Florida Constitution, and his rights to equal protection and due process of law under the Florida and Federal Constitutions.

I. FACTUAL BACKGROUND

A. The Florida Adoption Statute

Adoption is defined as a personal relationship created by one capable of adopting and one capable of being adopted, Korbin v. Ginsberg, 232 So.2d 417, 418 (Fla. 4th DCA 1970). Adoption, unknown at common law, is statutory in nature and can be decreed only in accordance with statute, id. In adoption proceedings, as in child custody proceedings, the court's primary duty is to serve the best interests of the child, In Re Adoption of H.Y.T., 458 So.2d 1127, 1128 (Fla. 1984). The legislative intent of the Florida adoption statute is to:
protect and promote the well-being of persons being adopted and their natural and adoptive parents and to provide to all children who can benefit by it a permanent family life.
§ 63.022, Fla. Stat. (1990). Courts are directed to enter orders as deemed necessary and suitable to promote and protect the best interest of the person to be adopted, § 63.022(2)(l). Suitability to adopt has rarely been challenged in Florida; advanced age and modest income of prospective adoptive parents have been rejected as grounds to deny adoption, In Re Adoption of Christian, 184 So.2d 657 (Fla. 4th DCA 1966); In Re Duke, 95 So.2d 909 (Fla. 1957). In adoption, as in all matters involving the care and custody of children, Florida courts are continually reminded of their obligation to protect the best interests of children, see Sulman v. Sulman, 510 So.2d 908, 909 (Fla. 4th DCA 1987); Bernstein v. Bernstein, 498 So.2d 1270, 1272 (Fla. 4th DCA 1986). "These paramount interests will be protected by the state and by the courts, ex mero motu," Bernstein, id.
The Florida adoption statute, approved by the legislature in 1977, § 63.042(3) holds, "No person eligible to adopt under this statute may adopt if that person is a homosexual." Since the enactment of the statute, unforeseen circumstances have occurred. The state of Florida amended its constitution to provide for a right to privacy. Society has become increasingly knowledgeable of homosexual behavior and more tolerant of this sexual orientation. Births of substance abused newborns and HIV infected newborns has sharply increased in the state. The Department of Health and Rehabilitative Services has experienced a corresponding crisis in the adoption placement of these impaired children.

*1222 B. The Children's Best Interests

In child custody proceedings, several jurisdictions have recently determined that the homosexuality of parents should not be a bar to either custody or visitation, Matter of Marriage of Cabalquinto, 669 P.2d 886 (Wash. 1983); M.A.B. v. R.B., 510 N.Y.S.2d 960 (N.Y. App. Div. 1986) (impermissible as a matter of law to determine custody on basis of father's homosexual orientation); S.N.E. v. R.L.B., 699 P.2d 875 (Alaska 1985) (consideration of mother's homosexual orientation appropriate only when shown to have adverse effect on child's health); Benzio v. Patenaude, 410 N.E.2d 1207 (Mass. 1980) (mother's homosexual orientation irrelevant to parenting skills). These courts, which have adopted the nexus approach to a parent's homosexuality, consider the parent's heterosexual or homosexual activity in custody determinations only if it is shown to adversely affect the child, see Note, Custody Determinations Involving the Homosexual Parent, XXII Family Law Quarterly, No. 1, 76 (1988). Such decisions reflect the results of recent studies which have shown children raised by homosexual parents to exhibit normal behavior patterns, Green, Sexual Identity of 37 Children Raised by Homosexual or Transsexual Parents, 135 Am. J. Psychiatry, 692, 696 (1978).
Mental health experts have found the incidence of same-sex orientation among the children of homosexual parents as randomly and in the same proportion as found among children in the general population, Susoeff, Assessing Children's Best Interests When a Parent is Gay or Lesbian: Toward a Rational Custody Standard, 32 UCLA L.Rev. 852, 882 (1985). Psychiatrists have found that children adopt sexual orientations independently from their parents, Susoeff, supra, and that homosexual men and women do not learn sexual preference by watching the sexual preference of their parents, Note, The Avowed Lesbian Mother and Her Right to Child Custody: A Constitutional Challenge That Can No Longer Be Denied, 12 San Diego L.Rev. 799, 861 (1975), see also Benzio v. Patenaude, 410 N.E.2d at 1216 (psychologist testimony that mixed sexual orientation of parents irrelevant to child's mental health).
Furthermore, experts agree that a child brought up in the tranquil home of a homosexual parent is better off than one growing up in a heterosexual home marked by domestic turmoil and lack of affection, Note, The Avowed Lesbian Mother, supra, at 860; Benzio v. Patenaude, 410 N.E.2d at 1215 (no evidence that children raised with loving couple of same sex are any more disturbed, unhealthy, or maladjusted than children raised with loving couple of mixed sex).
Although no appellate decision in Florida has addressed this issue, a circuit court recently adopted the nexus approach and awarded custody of a child to her deceased mother's homosexual partner, In Re Pearlman, No. 87-24926 DA (Fla. 17th Cir.Ct. 1989). The court found no evidence that the mother's partner's sexual preference had previously had, or would in the future have, any detrimental effect on the child, id. The court recognized the prevailing view in other jurisdictions that homosexuality should not in itself render a parent or custodian unfit for custody of, or visitation with, a minor child, id.; contra Roe v. Roe, 228 Va. 722, 324 S.E.2d 691 (1985) (father's homosexual relationship rendered him unfit custodian as matter of law); but cf. J.P. v. P.W., 772 S.W.2d 786 (Mo.So.Dist.Ct.App. 1989) (court cannot ignore effect parent's sexual conduct may have on child's future moral development and ordered supervised visitation with homosexual father).
The Supreme Court of Ohio recently approved the adoption of a special needs child by his psychological counselor who is a homosexual, In Re Adoption of Charles B., 552 N.E.2d 884 (Ohio 1990). The court's decision to allow the adoption relied heavily upon the absolute lack of evidence in the trial court that the adoption would not be in the child's best interest, id. Testimony showed, to the contrary, that the adoption would be in the child's best interest because his special needs required an adoptive parent with stability and flexibility, and the willingness to seek needed services, id.[1a] It was recognized that *1223 permanent placement in a judicially approved home environment was preferable to confining the child to an institution or to the life of transience from one foster home to another, id. at 889. Most importantly, Ohio recognized the advisability of permitting adoption on a case by case basis since the facts in each adoption case will vary, id. In deciding whether to approve an adoption, the court must consider all relevant factors before determining whether the child's best interest will be served, id.[2a]

C. Plaintiff Seebol

Plaintiff, Edward Seebol, resides in Key West and applied to the State of Florida to adopt a special needs child. Mr. Seebol has been a well respected resident and businessman of this city for twenty years. He has been participating in the state guardianship and guardian ad litem programs, and since the mid 1980's he has worked relentlessly in AIDS education and assistance to affected individuals. He is presently executive director of AIDS Help, Inc. He was notified by the Department of Health and Rehabilitative Services that since his application response revealed that he was a homosexual, the Department was unable to approve his application.

II. Conclusions of Law

A. The Right to Privacy in Florida

The right to privacy in Florida ensures that individuals may be free from governmental interference with their sexual orientation, Art. I, § 23, Fla. Const. During the adoption application process, the Department of Health and Rehabilitative Services inquires as to the sexual orientation of applicants. If the prospective parent answers truthfully that he or she is homosexual, the prospective parent is deemed ineligible to adopt. Significantly, the statute disqualifies not only prospective parents who engage in private sexual conduct, but also those who express a mere orientation toward homosexuality, even if unaccompanied by homosexual behavior. As will be demonstrated below, the inquiry into sexual orientation and consideration thereof, without regard for the child's best interests, violates Florida's right to privacy.
The Florida right to privacy has been described as "`the most comprehensive of rights and the right most valued by civilized man,'" Rasmussen v. South Florida Blood Service, 500 So.2d 533, 535 (Fla. 1987) [quoting Stanley v. Georgia, 394 U.S. 557, 564, 89 S.Ct. 1243, 1248, 22 L.Ed.2d 542 (1969)] and has been extended to include matters concerning procreation, contraception, family relationships, child rearing and education, Roe v. Wade, 410 U.S. 113, 152-153, 93 S.Ct. 705, 726-27, 35 L.Ed.2d 147 (1973); Shevin v. Byron, Harless, Schaffer, etc., 379 So.2d 633, 636 (Fla. 1980); compare Bowers v. Hardwick, 478 U.S. 186, 106 S.Ct. 2841, 92 L.Ed.2d 140 (1986) (no Federal Constitutional right to engage in homosexual sodomy).[3a]
The right to privacy was adopted in recognition of the state's, not the federal government's, responsibility for the protection of personal privacy, and was intended to encompass a broader realm of privacy rights than in the Federal Constitution, Winfield v. Div of Pari-Mutuel Wagering, 477 So.2d 544 (Fla. 1985). The right has been defined as an imbedded belief, rooted in constitutional traditions, that the individual has a fundamental right to be left alone so that he or she is free to lead a private life according his or her *1224 beliefs, free from unreasonable government intrusion, Public Health Trust v. Wons, 541 So.2d 96 (Fla. 1989). Privacy has been used interchangeably with the concept of liberty, both of which imply a fundamental right of self determination subject only to the state's compelling and overriding interest, In Re Guardianship of Estelle M. Browning, 15 F.L.W. S459 (Fla. Sept. 13, 1990); In Re T.W., a Minor, 551 So.2d 1186 (Fla. 1989); Winfield. The right to privacy in Florida has been construed to limit public disclosure of personal matters, Rasmussen (confidential blood donor information); Winfield (disclosure of psychiatric counselling records); to extend to personal decision making, In Re Guardianship of Estelle M. Browning (termination of life support for comatose person); Public Health Trust v. Wons (refusal of blood transfusion for religious reasons); Corbett v. D'Alessandro, 487 So.2d 368 (Fla. 2d DCA), review denied, 492 So.2d 1331 (Fla. 1986) (removal of nasogastric tube); and to the right of a teenage woman to decide whether to end her pregnancy, In Re T.W., a Minor.
The Florida Supreme Court has never directly addressed whether Art. I, § 23 encompasses sexual orientation. However, in 1978, two years before the ratification of Article I, § 23, the Florida Supreme Court held that a bar candidate's mere preference for homosexuality did not threaten his fitness to practice law. In Re: Florida Board of Bar Examiners, 358 So.2d 7, 10 (Fla. 1978). The Florida Supreme Court recognized that "[g]overnmental regulation in the area of private morality is generally considered anachronistic in the absence of a clear and convincing showing that there is a substantial connection between the private acts regulated and public interests and welfare," id. (citation omitted). In so holding, the Court relied on the due process and equal protection clauses, which are among the underpinnings of the right to privacy under the Federal Constitution. The strong message from In Re: Florida Board of Bar Examiners is that sexual orientation was entitled, in 1978, to at least some measure of constitutional protection.
The fact that two years later the people chose to expand constitutional protection for privacy strongly supports the position that they felt existing constitutional projections were inadequate and that the Florida right to privacy should encompass a broader realm of privacy rights than that in the Federal Constitution, Winfield v. Division of Pari-Mutuel Wagering, 477 So.2d 544 (Fla. 1985). That broader realm certainly must include protection for an individual's sexual orientation, which is a "decision[] vitally affecting his private life according to his own conscience," Public Health Trust v. Wons, 541 So.2d at 98, and protection against penalization of sexual orientation.
By inquiring into sexual orientation, and then penalizing an applicant based on his truthful response to that inquiry, the challenged statute unconstitutionally punishes the exercise of the right to privacy of prospective adoptive parents, cf., Harris v. McRae, 448 U.S. 297, 100 S.Ct. 2671, 65 L.Ed.2d 784 (1980). In Harris, 448 U.S. at 317, 100 S.Ct. at 2688, the United States Supreme Court, while upholding restrictions on federal funding for abortions, recognized a distinction between not subsidizing the exercise of constitutional rights and penalizing the exercise of those rights:
A substantial constitutional question would arise if Congress had attempted to withhold all medicaid benefits from an otherwise eligible candidate simply because that candidate had exercised her constitutionally protected freedom to terminate her pregnancy by abortion. This would be analogous to Sherbert v. Verner, 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965, where this Court held that a State may not, consistent with the First and Fourteenth Amendments, withhold all unemployment compensation benefits from a claimant who would otherwise be eligible for such benefits but for the fact that she is unwilling to work one day per week on her Sabbath.
The statute challenged here attempts to withhold the benefits of adoption to an otherwise qualified candidate because of that person's sexual orientation, and thus penalizes the exercise of that right.
*1225 The question, then, becomes whether the state has a compelling interest in inquiring into sexual orientation and, if so, whether its interest is advanced by this statutory scheme through the least intrusive means, In Re T.W., a Minor, 551 So.2d at 1192. In this case, the state has asserted no compelling interest, or, for that matter, any substantial or even rational interest.
Even if it had, the government interest involved is protecting the best interests of children to be adopted, and providing all children who can benefit from it a permanent family life, § 63.022. Moreover, the statute specifically recognizes that adoption can and does benefit adoptive parents. While the state's interest in protecting the best interests of children is admittedly compelling, that interest is not advanced by this statutory exclusion, In Re Guardianship of Estelle M. Browning; In Re T.W., a Minor; Winfield. Further, the state's interest in advancing the best interests of adoptive parents is totally frustrated by excluding an entire class of parents based upon their sexual orientation.
The statute suffers from the trite notions of homosexuals' unsuitability as fit parents and evidences discrimination through archaic stereotypes associated with homosexuals, Note, An Argument for the Application of Equal Protection Heightened Scrutiny to Classifications Based on Homosexuality, 57 So.Cal.L.R. 767, 821 (1984); Susoeff, supra. Homosexuals have been proven to be capable, loving parents whose sexual orientation is not necessarily adopted by their children, (see previous argument, The Children's Best Interests, supra, p. 3) Determining parents' suitability to adopt on a case by case basis, In Re Adoption of Charles B., would be a less intrusive means to accomplish the important state interest at stake. The sexual orientation of the adoptive parent should be considered as a factor in determining the adoption only if shown to directly and adversely affect the child, In Re Pearlman; Matter of Marriage of Cabalquinto; M.A.B. v. R.B.; S.N.E. v. R.L.B.; Benzio v. Patenaude. The statutory exclusion of one class of persons to become adoptive parents based upon their sexual orientation unconstitutionally, thus, interferes with their right to privacy under the Florida Constitution.

B. Equal Protection of Law

The equal protection clauses of the State and Federal Constitutions guarantee that all citizens similarly situated be treated alike, U.S. Const. amend. XIV, § 1.; Art. I, § 2, Fla. Const., City of Cleburne v. Cleburne Living Center, 473 U.S. 432, 439, 205 S.Ct. 3249, 3254, 87 L.Ed.2d 313 (1985). Government regulations challenged as violative of the equal protection clause are subjected to three standards of review; strict scrutiny, heightened scrutiny, and rational basis review, depending upon the nature of the class claiming discrimination, id. Governmental regulations are presumed valid under the equal protection clause as long as the classification drawn by the regulation "rationally furthers some legitimate, articulated state purpose," McGinnis v. Royster, 410 U.S. 263, 270, 93 S.Ct. 1055, 1059, 35 L.Ed.2d 282 (1972). However, governmental regulations that infringe upon the rights of a suspect class or violate a fundamental right will be subjected to strict scrutiny and sustained only if found suitably tailored to serve a compelling state interest, City of Cleburne v. Cleburne Living Center, 473 U.S. at 439, 205 S.Ct. at 3254.
Homosexuals clearly constitute a suspect class under equal protection analysis, Watkins v. United States Army, 875 F.2d 699, 711-724 (9th Cir.1989) (Norris, J. concurring), vacating 847 F.2d 1329 (9th Cir.1989) (extending suspect class status to homosexuals), cert. denied, No. 89-1806, Nov. 5, 1990.[4a] *1226 To warrant suspect class inquiry, it must first be determined whether the class at issue has been subjected to purposeful discrimination, id. It has been recognized that "`homosexuals have historically been the object of pernicious and sustained hostility,'" id., quoting Rowland v. Mad River Local School Dist., 470 U.S. 1009, 1014, 105 S.Ct. 1373, 1376-1377, 84 L.Ed.2d 392 (1985) (Brennan J., dissenting from denial of cert.), see Note, The Constitutional Status of Sexual Orientation: Homosexuality As A Suspect Classification, 98 Harv.L.Rev. 1285, 1299-1305 (1985); Note, An Argument for the Application of Equal Protection Heightened Scrutiny to Classifications Based on Homosexuality, 57 S.Cal.L.Rev. 797, 799-807 (1984).
The second factor to determine is whether the class is defined by a trait that bears no relationship to its ability to perform or function in society, Frontiero v. Richardson, 411 U.S. 677, 686, 93 S.Ct. 1764, 1770, 36 L.Ed.2d 583 (1973); Watkins, 875 F.2d at 725. It has been conclusively proven that homosexuals are fit parents and that their children do not learn sexual orientation from them, Green, supra; Susoeff, supra; Note, supra, The Avowed Lesbian Mother and Her Right to Child Custody: A Constitutional Challenge That Can No Longer Be Denied; see also Benzio v. Patenaude. Most stereotypes previously associated with homosexuals have been proven incorrect; homosexuality is no longer considered a mental or emotional illness, Susoeff, supra, at 870; Note, An Argument for the Application of Equal Protection Heightened Scrutiny to Classifications Based on Homosexuality, supra, at 823; nor have homosexuals been proven more likely than heterosexuals to be child molesters, Note, An Argument for the Application of Equal Protection Heightened Scrutiny to Classifications Based on Homosexuality, supra, at 823. Furthermore, the argument that children should not be parented by homosexuals because they will be subjected to community and peer harassment is constitutionally unsound, see Palmore v. Sidoti, 466 U.S. 429, 104 S.Ct. 1879, 80 L.Ed.2d 421 (1984). Discrimination against homosexuals, thus, bears deep-seated prejudice rather than reality, Watkins, 875 F.2d at 725.
A third factor to be considered is the political powerlessness of the minority group, Cleburne, 473 U.S. at 441, 105 S.Ct. at 3255; Watkins, at 726. Because of past stigmatization associated with homosexuality, many homosexuals conceal their sexual orientation and fail to participate in organizations seeking gay rights advances, Note, An Argument for the Application of Equal Protection Heightened Scrutiny to Classifications Based on Homosexuality, supra, at 826. The homosexuals who do advocate their rights are not openly received, nor endorsed, by legislators, id., Watkins, at 727. The continued existence of laws discriminating against homosexuals, the judiciary's approval of such laws, and the legislators' unwillingness to repeal them, all prove homosexuals' political powerlessness, id.
Lastly, the suspect class must be defined by traits which are immutable, Cleburne, 473 U.S. at 440, 105 S.Ct. at 3254-57; Watkins, 875 F.2d at 725. "[S]cientific research indicates that we have little control over our sexual orientation and that once acquired, our sexual orientation is largely impervious to change," Watkins, at 726; Note, An Argument for the Application of Equal Protection Heightened Scrutiny to Classifications Based on Homosexuality, supra, at 818-821.
Since homosexuals should constitute a suspect class, the statutory exclusion at issue must be upheld only if necessary to a compelling government interest, accomplished by the least restrictive means, Watkins. Although the government interest, the best interests of children, is absolutely compelling, it is definitely not accomplished by the least restrictive means, (see previous argument, The Children's Best Interests, supra, p. 3). The Florida adoption statute which denies eligibility to prospectively fit parents defeats its very purpose of providing to all children who can benefit by adoption a permanent family life. The statute is poorly tailored to achieve its compelling interest and must be stricken.
Even were this court to deny suspect class status to homosexuals, the regulation at issue is also not rationally related to a legitimate, *1227 articulated state purpose, McGinnis v. Royster, compare Ben-Shalom v. Marsh, 881 F.2d at 463 (army regulation making homosexuality nonwaivable disqualification for service rationally related to military policy and regulation). The best interests of children are not supported by the regulation which is clearly irrelevant to the promotion of any legitimate state goal, Cleburne. A governmental regulation which spites its own articulated goals, Stanley v. Illinois, cannot sustain any level of constitutional analysis. The Florida adoption statute, thus, is blatantly unconstitutional and must be stricken.

C. Due Process of Law

The due process clause of the United States and Florida Constitutions guarantees all citizens the right to life, liberty and property without state interference, U.S. Const. amend. XIV, § 1; Art. I, § 9, Fla. Const. "`[F]reedom of personal choice in matters of ... family life is one of the liberties protected by the Due Process Clause of the Fourteenth Amendment,'" Smith v. Organ. of Foster Families for E. & Reform, 431 U.S. 782, 842, 97 S.Ct. 2094, 2108, 53 L.Ed.2d 14 (1977), quoting Cleveland Board of Education v. LaFleur, 414 U.S. 632, 639-640, 94 S.Ct. 791, 796, 39 L.Ed.2d 52 (1974). The "`private realm of family life which the state cannot enter,'" has been afforded both substantive and procedural due process protection, Smith, id., quoting Prince v. Massachusetts, 321 U.S. 158, 166, 64 S.Ct. 438, 442, 88 L.Ed.2d 645 (1944). Although the traditional understanding of the concept of "family" has historically involved relationships between parent and child, biological relationships do not exclusively determine the existence of a family, Smith, 431 U.S. at 845, 97 S.Ct. at 2109, 2110. A deeply loving and interdependent relationship between an adult and child in his or her care may develop absent genetic ties, id. Furthermore, adoption is considered the legal equivalent of biological parenthood, id. at n. 51. Adoptive parents who have developed emotional ties with children in their care, similarly to natural parents, have a protected liberty interest in their familial relationships with their children, id., Spielman v. Hildebrand, 873 F.2d 1377, 1384 (10th Cir.1989). Preadoptive parents also may be conferred a liberty interest in their familial relationships with their children because of the possibility of developing a permanent adoptive relationship, Spielman v. Hildebrand, id.
However, the liberty interest derived from this emotional, rather than biologic, family relationship may be limited when the relationship has its foundations in state law, id., Smith, 431 U.S. at 845, 97 S.Ct. at 2109, 2110. When the liberty interest at issue derives from a knowingly assumed contractual relation with the state, the expectations and entitlements of the parties under state law must be examined, id. The Florida adoption statute confers the right to apply for adoption upon married and unmarried adults, and, thus, creates a legitimate expectation and entitlement to all citizens, id. Therefore, the narrow liberty interest at issue deprived to homosexuals is the right to apply for adoption and, thus, enjoy the possibility of a statutorily-created family relationship. The homosexual's liberty interest to apply for adoption is, thus, created, rather than limited, by state law.
The type of procedure required by the standards of due process is determined by the precise nature of the government function involved plus the private interest affected by governmental action, Stanley v. Illinois, 405 U.S. 645, 650, 92 S.Ct. 1208, 1212, 31 L.Ed.2d 551 (1972). The intent of the Florida adoption statute, in addition to protecting the prospective adoptees' best interests, is to also promote and protect the wellbeing of the natural and adoptive parents involved, § 63.022(1), Fla. Stat. (1990). The statute intends to "provide to all children who can benefit by it a permanent family life," § 63.022(1). A detailed but necessary procedure to insure that the child's and the natural and adoptive parents' well-being is protected is evident in the statute. The state's interests in implementing the statute are, thus, legitimate and within its power, Stanley v. Illinois, 405 at 650, 92 S.Ct. at 1212.
The procedure to determine suitability to adopt, however, is entirely denied to homosexuals *1228 in Florida. Although the state claims a statutory intent of the best interests of children, the statute deprives children of the possibility of adoption by an entire group of individuals historically shown to be fit and capable parents, Green, supra; Susoeff, supra; Note, The Avowed Lesbian Mother, supra. Additionally, a special needs child requires great care and may be unsuitable for adoption by most families. Such children may conceivably spend their prematurely shortened lives in state foster institutions and may never experience the joy of family life or care by a devoted parent, In Re Adoption of Charles B. It is in the best interests of these children to be adopted by a caring homosexual parent rather than to languish alone and unwanted in a state institution, id. Thus, the government function involved completely fails to achieve its legislative intent of providing a permanent family life to all children who can benefit by it. The Florida statute which denies homosexuals the right to determine eligibility for adoption deprives them of procedural due process of law and violates both the State and Federal Constitutions.
Violations of the guarantee of substantive due process of law have been found in deliberate decisions of governmental officials to deprive a person of life, liberty or property, Daniels v. Williams, 474 U.S. 327, 106 S.Ct. 662, 665, 88 L.Ed.2d 662 (1986). Statutory exclusions which create presumptions and deny the opportunity of proof are also found violative of substantive due process, Stanley v. Illinois, (disapproving statutory presumption of parental unfitness by unmarried father); Vlandis v. Kline, 412 U.S. 447, 93 S.Ct. 2230, 37 L.Ed.2d 63 (1973) (finding statutory presumption of nonresidency for college student violative of due process); Carrington v. Rash, 380 U.S. 89, 85 S.Ct. 775, 13 L.Ed.2d 675 (1965) (disapproving state blanket exclusion of voting rights for servicemen stationed within state). Stanley v. Illinois, 405 U.S. at 657-658, 92 S.Ct. at 1215, cautions against state preference for prompt efficacious procedure when citizens' rights are jeopardized:
Procedure by presumption is always cheaper and easier than individualized determination. But when, as here, the procedure forecloses the determinative issues of competence and care, when it explicitly disdains present realities in deference to past formalities, it needlessly risks running roughshod over the important interests of both parent and child. It therefore cannot stand.
The Florida statutory presumption which precludes the consideration of homosexuals as parents suitable for adoption similarly jeopardizes individuals' rights in the interest of state convenience. "[T]he State spites its own articulated goals," by depriving these children of the possibility of family life, Stanley v. Illinois, 405 U.S. at 653, 92 S.Ct. at 1213. Furthermore, the state has reasonable alternative means of determining whether individual homosexuals would be suitable parents to qualify for adoption, Vlandis v. Kline, 412 U.S. at 451, 93 S.Ct. at 2236. Homosexuals may be evaluated for adoption fitness as other prospective adoptive parents according to the criteria of chapter 63. The prospective parent's sexual orientation should be one of many factors considered by the Department of Health and Rehabilitative Services in determining whether the adoption at issue would be in the child's best interest, In Re Adoption of Charles B. The sexual orientation of the parent seeking adoption should be accorded the same treatment as the natural parent seeking custody; sexual orientation should not disqualify a parent for fitness but should be a factor to be considered as it bears upon the best interests of the child, In Re Pearlman; Matter of Marriage of Cabalquinto; M.A.B. v. R.B.; S.N.E. v. R.L.B.; Benzio v. Patenaude. The adoption statute which forbids adoption by homosexuals is, thus, not a reasonable alternative means of determining suitability for adoption and must be stricken as violative of substantive due process. The statute presumes, rather than proves, unfitness to adopt by homosexuals solely because it is more convenient to presume rather than prove, Stanley, 405 U.S. at 658, 92 S.Ct. at 1216. Under the due process clause such advantage for the state is insufficient to justify refusing prospective adoptive parents, and children who *1229 may benefit from the adoption, the possibility of a permanent family relationship, id.
Based upon the aforementioned conclusions, § 63.042(3), Fla. Stat. (1990) is hereby declared constitutionally invalid.

APPENDIX B
Marcia Barinaga, Is Homosexuality Biological?, Science, Aug. 30, 1991, at 956 (discussing studies on the biological differences between homosexual and heterosexual men;
Chandler Burr, Homosexuality and Biology, The Atlantic Monthly, Mar. 1993, at 47 (providing an overview of research on the question of sexual orientation and homosexuality);
Mary B. Harris & Parlene J. Turner, Gay and Lesbian Parents, J. Homosexuality, Winter 1985/86, Vol. 12 (anonymous study of homosexual parents and heterosexual single parents suggests that being homosexual is compatible with effective parenting;
Constance Holden, Twin Study Links Genes to Homosexuality, Science, Jan. 3, 1992, at 33 (finding that genes play a strong role in homosexuality);
Simon LeVay, A Difference in Hypothalamic Structure Between Heterosexual and Homosexual Men, Science, Aug. 30, 1991, at 1034 (finding a biological difference between homosexual and heterosexual men);
Arthur Lipkin, Project 10, Gay and Lesbian Students Find Acceptance in Their School Community, Teaching Tolerance, Fall 1992, at 25 (arguing that study units and support groups are means to increase tolerance toward homosexuals within early grades);
J. Charlotte Patterson, Children of Lesbian and Gay Parents, Child Dev., Oct. 1992, at 1025 (examining the personal and social development of children with gay and lesbian parents);
Raloff, Perinatal Dioxin Feminizes Male Rats, [unknown magazine], May 30, 1992, at 359 (discussing experiments with the reproductive system of rats);
Michael Ruse, Are There Gay Genes? Sociobiology and Homosexuality, J. Homosexuality, Summer 1981, Vol. 6(4) (considering sociobiologists' claims concerning homosexuality);

Sex on the Brain, Science, July 31, 1992, at 620 (suggesting that homosexuality may be a product of genetics and biochemistry rather than culture);

Catechism Easier on Gays; Hard on Poor Work, Wages, Sarasota Herald-Tribune, Nov. 17, 1992, at 14A (Catholic church is more tolerant toward homosexuals).
The following law review articles and reports are not included in the record on appeal, but are relied on by the parties in their motions and pleadings filed in the trial court:
Fajer, Can Two Real Men Eat Quiche? Storytelling, Gender-Role Stereotypes, and Legal Protection for Lesbians and Gay Men, 46 U.Miami L.Rev. 511 (1992);
Susoeff, Assessing Children's Best Interests When a Parent is Gay or Lesbian: Toward a Rational Custody Standard, 32 UCLA L.Rev. 852 (1985);
Note, An Argument for the Application of Equal Protection Heightened Scrutiny to Classifications Based on Homosexuality, 57 S.Cal.L.Rev. 767 (1984);
Note, The Avowed Lesbian Mother and Her Right to Child Custody: A Constitutional Challenge that Can No Longer be Denied, 12 San Diego L.Rev. 799 (1975);
Note, Custody Determinations Involving the Homosexual Parent, 22 Fam.L.Q. 76 (1988);
Green, Sexual Identity of 37 Children Raised by Homosexual or Transsexual Parents, 135 Am.J. Psychiatry 692 (1978).
NOTES
[1] Although the complaint alleges that the letter is attached, we have not located a copy of the letter in the record on appeal.
[2] Because the Seebol decision is not published in an official Florida volume, and to avoid extensive quotations from that opinion, we attach a copy of that circuit court opinion as Appendix A.
[3] The Attorney General was properly notified of this action because of the challenge to the constitutionality of a state statute. See § 86.091, Fla. Stat. (1991). The Attorney General declined to appear as a party in defense of the statute.
[4] These articles are briefly described in Appendix B.
[5] In this context, it is noteworthy that a recent amendment to the Rules Regulating the Florida Bar prohibits a lawyer from knowingly discriminating against a litigant based on "sexual orientation." The amendment to rule 4-8.4 becomes effective January 1, 1994.
[6] We have obtained and reviewed the legislative history concerning chapter 77-140. At various hearings, legislators expressed some concern about the need for a definition. One legislator observed that a dictionary definition of "homosexual" was based on sexual desire and not on sexual activity. In rejecting the need for a statutory definition, the legislature appears to conclude that sexual desire is not the controlling issue and that citizens did not need a definition to know the nature of the conduct that was being regulated in the best interests of children.
[7] We distinguish the Third District's recent opinion concerning a municipal regulation requiring all job applicants to sign an affidavit stating that they have not used tobacco for at least one year. Kurtz v. City of North Miami, 625 So.2d 899 (Fla. 3d DCA 1993). In that case, the regulation expressly required governmental inquiry concerning private matters.
[8] The concurring opinion of Justice Stevens in City of Cleburne, in which Chief Justice Rehnquist joined, suggests that the Court has not adopted three rigid tests but rather "a continuum of judgmental responses to differing classifications." 473 U.S. at 450, 105 S.Ct. at 3260. The separate opinion of Justice Marshall, joined by Justices Blackmun and Brennan, regards as "superfluous" the discussion of heightened scrutiny in Justice White's opinion for the court. Thus, it is not entirely clear that City of Cleburne contained a holding that established specific levels of equal protection review. See Heller v. Doe by Doe, ___ U.S. ___, ___, 113 S.Ct. 2637, 2650, 125 L.Ed.2d 257 (1993) (Blackmun, J., dissenting).
[9] We recognize that at least one judge has taken the position that homosexuality is a suspect class. See Watkins v. United States Army, 875 F.2d 699, 724-28 (9th Cir.1989) (Norris, J., concurring), cert. denied, 498 U.S. 957, 111 S.Ct. 384, 112 L.Ed.2d 395 (1990). Likewise, some law review articles have advocated this approach. See Note, The Constitutional Status of Sexual Orientation: Homosexuality as a Suspect Classification, 98 Harv.L.Rev. 1285 (1985); Note, An Argument for the Application of Equal Protection Heightened Scrutiny to Classifications Based on Homosexuality, 57 S.Cal.L.Rev. 767 (1984).
[10] This reason may not be the only rational reason in support of this statute, but it is a sufficient reason to support the constitutionality of the statute in this case. We note, however, that we are not relying upon any possible injury the children might arguably sustain due to private biases or perceived prejudices against homosexuals. We are not overlooking the pressures and stresses that peer groups might place on an adopted child because of the adoptive parent's homosexual activity. We simply are not convinced that such "private biases" are a permissible rational basis to support this statute. See Palmore v. Sidoti, 466 U.S. 429, 104 S.Ct. 1879, 80 L.Ed.2d 421 (1984); Pruitt v. Cheney, 963 F.2d 1160, 1165 (9th Cir.1991), cert. denied, ___ U.S. ___, 113 S.Ct. 655, 121 L.Ed.2d 581 (1992).
[11] This opinion expressly declares section 63.042(3) to be valid at least concerning the plaintiffs' challenge under the right of privacy. It may also construe a provision of the state or federal constitution. As a result, the supreme court should have the discretion, but not the obligation, to review this case. See Fla.R.App.P. 9.030(a)(2). In light of the limited record on appeal, we question whether this is the appropriate case in which to finally resolve these constitutional issues. We have declined to certify this case as a matter of great public interest because of its limited record.
[1a] Charles B. suffered from leukemia, in remission, possible brain damage from fetal alcohol syndrome, a low I.Q. and speech disorder. He was the victim of neglect and abuse from his natural family and had been in permanent custody of the state since he was three years old. He had lived in four foster homes.
[2a] New Hampshire, which has no state right to privacy, has affirmed the constitutionality of its statutory amendment which excludes eligibility of homosexuals as adoptive parents, Opinion of the Justices, 530 A.2d 21 (N.H. 1987). New Hampshire and Florida are the only two states with statutory exclusions for adoption by homosexuals.
[3a] Retired Supreme Court Justice Lewis F. Powell, Jr. recently announced that he recognized his mistake in not voting for an extension of the constitutional right to privacy in Bowers v. Hardwick. Justice Powell now found the 5-4 majority opinion "`inconsistent in a general way'" with the precedent established by Roe v. Wade, When Second Thoughts In Case Come Too Late, N.Y. Times, Nov. 5, 1990, § A, at 9.
[4a] Because there is no fundamental right to engage in homosexual conduct, Bowers v. Hardwick, 478 U.S. 186, 106 S.Ct. 2841, 93 L.Ed.2d 140, several Federal Courts have denied suspect class status to homosexuals, High Tech Gays v. Defense Industrial Security Clearance Office, 895 F.2d 563 (9th Cir.1990); Ben-Shalom v. Marsh, 881 F.2d 454 (7th Cir.1989) (not addressing suspect class status), reversing 703 F. Supp. 1372, 1380 (E.D.Wis. 1989) (extending suspect class status to homosexuals), cert. denied, 494 U.S. 1004, 110 S.Ct. 1296, 108 L.Ed.2d 473, 1990); Woodward v. United States, 871 F.2d 1068 (D.C. Cir.1989), cert. denied, 494 U.S. 1003, 110 S.Ct. 1295, 108 L.Ed.2d 473 (1990); Padula v. Webster, 822 F.2d 97 (D.C. Cir.1987).