Request of the House of Representatives
No. 87-080

OPINION OF THE JUSTICES

May 5, 1987

The following reply was returned:

*To The Honorable House of Representatives:*

The undersigned justices of the Supreme Court submit the following answers to the questions contained in your resolutions submitted to this court on March 4 and April 3, 1987. Interested parties were permitted to file memoranda with the court until April 22, 1987.

House Bill 70, if enacted, would prohibit homosexual persons from being foster parents, adoptive parents, or child care agency operators. It would accomplish this objective by amending the relevant statutes. RSA 170-B:4 would be amended to preclude homosexual persons from adopting any individual. RSA 170-F:6, I (Supp. 1986) would be amended to exclude from the category of appropriate adoptive families those foster families "in which one or more of the adults is a homosexual." In like manner, RSA 161:2, IV (Supp. 1986) would be amended to prohibit the department of health and human services from granting a license to any foster family home which contains one or more adult homosexual persons. The last substantive section of the bill would amend RSA 170-E:4 (Supp. 1986) by adding a new paragraph mandating denial of any application for a license to operate a child care facility "if the department determines that the applicant is unfit for licensure by reason of being a homosexual." We read this provision of the bill as requiring denial in any case where the applicant is found to be a homosexual within the meaning of the proposed definition. While our reading of this last section of the bill is only one possible reading, as its language is ambiguous regarding whether the department would have discretion to determine that a particular applicant's homosexuality would not render him or her unfit to operate a child care agency, this more restrictive reading comports most closely with the bill's announced purpose to "*prohibit*[ ] *any person who is homosexual* from adopting any person, from being licensed as a member of a foster family, and *from running day care centers.*" (Emphasis added.)

Before expressing our opinion on the questions posed by the house of representatives, two preliminary observations regarding the definition of homosexuality contained in House Resolution 32 are in order. The resolution would define a homosexual for purposes of House Bill 70 as "any person who performs or submits to any sexual act involving the sex organs of one person and the mouth or anus of another person of the same gender." This very narrow definition of

homosexual behavior contains no requirement that the acts or submission thereto be uncoerced, nor does there appear to be any temporal limitation regarding when the acts are to have occurred. Therefore, we assume for purposes of our analysis, first, that one who performs or submits to the acts described in the definition does so both voluntarily and knowingly; by doing so, we are able to avoid the patently absurd result of the inclusion of a victim of homosexual rape within the scope of the definition and his or her consequent preclusion from adopting, from becoming a foster parent, and from operating a child care agency. Second, we interpret the definition's present tense usage to mean that the acts bringing an individual within the definition's ambit must be or have been committed or submitted to on a current basis reasonably close in time to the filing of an application for licensure or a petition for adoption. This interpretation thus excludes from the definition of homosexual those persons who, for example, had one homosexual experience during adolescence, but who now engage in exclusively heterosexual behavior.

In addition, we note that we shall consider in this opinion only prospective application of the exclusions contained in the bill. We therefore express no opinion on the constitutionality of applications which would result in the interruption or termination of any existing arrangements.

Finally, we caution that this opinion makes no attempt to anticipate particular issues that may arise only as the statutory amendments are in fact applied, assuming enactment of the bill. There is no practical opportunity to deal with the range of such possible issues in advance.

The first question we have been asked to answer is whether the bill, if enacted into law, would violate the equal protection clauses of either the State or Federal Constitution. N.H. CONST. pt. I, arts. 2 and 12; U.S. CONST. amend. XIV.

For purposes of federal equal protection analysis, homosexuals do not constitute a suspect class, nor are they within the ambit of the so-called "middle tier" level of heightened scrutiny, as sexual preference is not a matter necessarily tied to gender, but rather to inclination, whatever the source thereof. Nor is there a fundamental right to engage in homosexual sodomy. *See Bowers v. Hardwick*, 106 S. Ct. 2841 (1986). There is, further, no such right to adopt, to be a foster parent, or to be a child care agency operator, as these relationships are legal creations governed by statute. Therefore, since no suspect or quasi-suspect class or fundamental right is involved, the proper test to apply in determining the bill's constitutionality for federal equal protection purposes is whether the legis-

lation is "rationally related to a legitimate governmental purpose." *Cleburne v. Cleburne Living Center, Inc.*, 473 U.S. 432, 446 (1985).

The purpose of the bill, as stated in House Resolution 32, is to promote "the provision of a healthy environment[,] . . . role model[s] . . . [and] positive nurturing" to children affected by State-approved or -licensed activities and to eliminate the "social and psychological complexities" which living in a homosexual environment could produce in such children. In general, we accept the assertion that the provision of appropriate role models is a legitimate government purpose. The question, then, is whether a blanket exclusion of homosexuals from adoption, foster parentage, and child care agency licensure is rationally related to the achievement of this purpose. It is not our business to inquire into the wisdom or desirability of the legislature's choice. *Sedgewick v. City of Dover*, 122 N.H. 193, 198, 444 A.2d 490, 492 (1982). It may, however, be preferable to deal with the present issue as the State may now do, as one of a number of relevant factors on a case-by-case basis. The question before us is nonetheless the narrow one, whether the proposed choice may constitutionally be made.

■ It is our opinion that the exclusion of homosexuals, as narrowly defined by your resolution, from foster parentage and adoption can be found to be rationally related to the bill's purpose, expressed in House Resolution 32, to provide appropriate role models for children, but we are unable to conclude that such an exclusion vis-à-vis operators of all types of child care agencies is so related. The rationale underlying the role model theory is that persons in the position of parents are the primary role models after whom children consciously or unconsciously pattern themselves. Although opponents of the bill have cited a number of studies that find no correlation between a homosexual orientation of parents and the sexual orientation of their children, the source of sexual orientation is still inadequately understood and is thought to be a combination of genetic and environmental influences. *See* Susoeff, *Assessing Children's Best Interests When a Parent is Gay or Lesbian: Toward a Rational Custody Standard*, 32 UCLA L. REV. 852, 883 n.194 (1985) (environmental conditioning one factor in development of sexual orientation). Given the reasonable possibility of environmental influences, we believe that the legislature can rationally act on the theory that a role model can influence the child's developing sexual identity. Obviously, this theory most likely holds true in the parent-child or other familial context. We are not satisfied, however, that it would hold true outside such a context (nor, of course, are we dealing with the termination of parental rights, or others otherwise

affecting existing familial relationships). Thus, we are unable to accept the role model theory as providing a rational basis on which to exclude homosexuals as a class from operating all of the types of facilities defined in RSA chapter 170-E (Supp. 1986). To extend it to all such facilities would, we believe, paint with too broad a brush and extend the theory beyond the point of its rational application. This is especially evident in light of the bill's use of the term "applicant" as the entity whose sexuality is at issue. It would often be the case that the applicant would not be a human being at all, but rather a corporation, for example. In addition, even if the applicant were a human being, he or she might have little or no contact with the children for whom services were to be provided, in which case the applicant's sexual preference would be irrelevant.

Moreover, any analysis of rational basis must take into account the State's especially great responsibility in the foster care and adoption contexts to provide for the welfare of the children affected by placement decisions. In foster care and adoption cases, the State by law has either the exclusive, or a highly significant, responsibility to choose what is best for the child. In the day care context, however, parental responsibility for choice supplements the State's obligations.

Our analysis must also consider the fact that foster care and adoption involve giving one or two individuals custody of and control over children so placed, and that, as a result, the choice of the child's care provider becomes especially important. In contrast, the non-continuous nature of the provision of many day care services, like the non-continuous nature of the supervision of children involved in teaching, for example, weakens the role model rationale to the point that we are unable to say that the bill is constitutional as to child care agencies other than foster family homes.

To reiterate the point, it is in those living situations approximating a familial or parent-child arrangement that the role model theory provides a rational basis on which to exclude homosexuals as defined by the resolution from participation therein, because it is in the familial context that the theory of learned sexual preference is most likely to be true. We are not satisfied that the theory would provide a rational basis for a blanket exclusion of all homosexuals from being day care center operators or other non-full-time child caretakers. Such cases must be the subject of specific determinations by licensing authorities.

■■ The question of whether the bill violates the equal protection guarantee of the New Hampshire Constitution involves a similar inquiry. As under the Federal Constitution, no suspect class is

involved, nor is heightened scrutiny requiring application of the fair and substantial relation test, *see Carson v. Maurer*, 120 N.H. 925, 932, 424 A.2d 825, 831 (1980), appropriate. The proper test under the State Constitution is, again, the rational relationship test. *See Estate of Cargill v. City of Rochester*, 119 N.H. 661, 667, 406 A.2d 704, 707 (1979). We have determined above that the proposed legislation is rationally related to a legitimate governmental purpose insofar as it applies to adoption and foster care. Therefore, no right of equal protection of the laws under the State Constitution would be violated by the proposed legislation except, possibly, as we have noted, as to child care agencies other than foster family homes. For that reason, there is no need to give further consideration to the issue of the constitutionality of the exclusion of homosexuals from operating child care agencies other than foster family homes, and we will treat the bill as though that provision had been excised.

■■ The second question we have been asked to render an opinion on is whether House Bill 70 would violate the due process clause of either the Federal or State Constitution. U.S. CONST. amend. XIV; N.H. CONST. pt. I, art. 15. We answer that it would not. First and foremost, there is no cognizable liberty or property interest in becoming a foster parent or in adopting a child, and thus no entitlement thereto. Mere desire or expectation does not rise to the level of an interest requiring procedural due process protections. *See Daley v. Town of New Durham*, 733 F.2d 4, 7 (1st Cir. 1984). If the question is intended to raise an issue of substantive due process, the answer is again in the negative, because the exclusion of homosexuals from these activities bears a rational relationship to the government's legitimate objective of providing adopted and foster children with appropriate parental role models.

Second, with regard to the related notion that the classification created by the bill would function as an irrebuttable presumption at constitutional odds with due process, we note that the bill does not speak of a presumption, although the request for opinion does employ the term. We answer that the classification so created is not one of the sort struck down by the United States Supreme Court in *Stanley v. Illinois*, 405 U.S. 645 (1972), or in *Vlandis v. Kline*, 412 U.S. 441 (1973). *Vlandis* involved a presumption of non-residency that could have been disproved had it not been for the conclusive nature of the presumption at issue. *Stanley* similarly involved a presumption that unwed fathers were unfit parents. *Stanley* thus was concerned both with an immediately disprovable presumed fact and a *legally cognizable* interest not at issue here, namely that of a parent in the custody of his own children, and a risk of harm from pa-

rental unfitness that could readily be remedied when and if it actually occurred.

In contrast, the classification created here embodies a prediction of a risk not immediately disprovable by contrary evidence and one that does not implicate any fundamental interest, and it addresses a risk of harm that would not be readily reversible in those cases in which it could be expected to occur. Thus, *Stanley* and *Vlandis* are inapposite, as is our own case of *State v. Robb*, 125 N.H. 581, 484 A.2d 1130 (1984), which arose in a criminal context involving commitment to a mental hospital.

 Therefore, the proposed bill does not unconstitutionally deprive homosexuals as defined of due process of the laws under either the State or Federal Constitution.

 The third question posed by the legislature is whether the proposed bill would violate any substantive right to privacy under either the State or Federal Constitution. We answer that it would not, resting our determination upon the United States Supreme Court's decision in *Bowers v. Hardwick*, 106 S. Ct. 2841 (1986), wherein the Court stated that the substantive due process line of cases exemplified by *Griswold v. Connecticut*, 381 U.S. 479 (1965), did not confer a fundamental right to engage in consensual homosexual sodomy because "[n]o connection between family, marriage, or procreation on the one hand and homosexual activity on the other has been demonstrated. . . . Moreover, any claim that these cases nevertheless stand for the proposition that any kind of private sexual conduct is constitutionally insulated from state proscription is unsupportable." *Bowers*, 106 S. Ct. at 2844. In addition, we note that no intrusion by the State in this context is possible unless and until an individual invites it by voluntarily seeking to adopt or to be licensed as a foster parent. Only then would the State pose questions about the individual's private life, as the agent responsible for preserving and furthering the welfare of its children. *See* RSA 170-B:14 (Supp. 1986); RSA 170-E:4, I (Supp. 1986). We should add that this opinion is not meant to suggest that the State might have a similar authority to delve into the privacy of existing marital or custodial relationships. The same result would hold true under the State Constitution.

 Likewise, there is no infringement upon any right of freedom of association under either the Federal or State Constitution, as the existence of any such right in this context must necessarily depend upon the assertion and recognition of rights to privacy or to engage in adoption or foster care, which we have explicitly

rejected. Because, moreover, there is no privacy-grounded right to engage in consensual homosexual sodomy, *see Bowers supra*, there is no corresponding right to freedom of association for such a purpose. *See* 3 R. ROTUNDA, J. NOWAK, J. NELSON YOUNG, TREATISE ON CONSTITUTIONAL LAW § 20.41, at 200 (1986). Because we find no right to privacy or association which would be infringed by this bill if enacted into law, we answer questions three and four in the negative, as we do also question five.

The remaining question posed for our consideration is that contained in House Resolution 32: "whether the legislature can properly classify children in the care of the state as a class for purposes of excluding homosexuals from adopting them or serving as foster parents or day care operators." We respectfully decline to answer the question posed because it is not germane to the constitutional issues raised. The pertinent classification is that of the group subject to the bill, to wit: homosexuals, as narrowly defined by the resolution, and not the group intended to be protected; namely, children in the care of the State. Therefore, we respectfully decline to answer the supplemental question posed by House Resolution 32.

In conclusion, therefore, we answer that, as to the first question posed in House Resolution 23, the bill, if embodying the assumptions expressed in this opinion, would be constitutional as applied to adoption and the licensing of foster parents, but we do not accept the role model theory as establishing the required rational relationship in the day care context. We answer the remaining four questions, with application only to adoption and foster care, in the negative, and we respectfully decline to answer the additional question posed by House Resolution 32.

> DAVID A. BROCK
> DAVID H. SOUTER
> WILLIAM R. JOHNSON
> W. STEPHEN THAYER, III

The resolution which we review today avows that the purpose of House Bill 70 is to protect children rather than to punish homosexual conduct. Ironically, homosexual conduct as defined in the resolution is not a crime in our State, yet heterosexual adultery is. The State is never more humanitarian than when it acts to protect the health of its children. The State is never less humanitarian than when it denies public benefits to a group of its citizens because of ancient prejudices against that group.

The bill presumes that every homosexual is unfit to be an adoptive parent or to provide foster or day care. It thus precludes every homosexual from demonstrating his or her skills as a parent. Finan-

cial stability is irrelevant; the strength to discipline a child firmly yet patiently is irrelevant; and the courage and love to be generous and loyal, the intelligence to provide proper education, and similar attributes are all irrelevant. Yet the legislature has no rational basis for concluding that homosexuals will be deficient in these characteristics "in the run of cases." *State v. Robb*, 125 N.H. 581, 586, 484 A.2d 1130, 1133 (1984). The legislature received no meaningful evidence to show that homosexual parents endanger their children's development of sexual preference, gender role identity, or general physical and psychological health any more than heterosexual parents. The legislature received no such evidence because apparently the overwhelming weight of professional study on the subject concludes that no difference in psychological and psychosexual development can be discerned between children raised by heterosexual parents and children raised by homosexual parents. Susoeff, *Assessing Children's Best Interests When A Parent Is Gay or Lesbian: Toward A Rational Custody Standard*, 32 UCLA L. REV. 852, 882 and n.192 (1985); *see also* Golombok, Spencer, Rutter, *Children in Lesbian and Single-Parent Households: Psychosexual and Psychiatric Appraisal*, 24 J. CHILD PSYCHOL. PSYCHIAT. 4:551 (1983); Green, Mandel, Hotvedt, Gray, Smith, *Lesbian Mothers and Their Children: A Comparison with Solo Parent Heterosexual Mothers and Their Children*, 15 ARCH. SEX. BEH. 2:167 (1986); Harris, Turner, *Gay and Lesbian Parents*, 12 J. HOMOSEXUALITY 2:101 (1985); Kleber, Howell, Tibbits/Kleber, *Issues Arising With Lesbian Mothers In Child Custody Disputes*, BULL. AMER. ACAD. PSYCHIATRY AND LAW (1985). This, of course, is the conclusion reached by the large majority of the House Judiciary Committee in reply to this court's request for factual findings.

In *Petition of Bagley*, 128 N.H. 275, 283–84, 513 A.2d 331, 337 (1986), this court recognized that a person may be constitutionally entitled to due process from the State under part I, article 15 of the New Hampshire Constitution even when his or her interest was not "natural, essential, and inherent." *See also Duffley v. N.H. Interschol. Ath. Assoc., Inc.*, 122 N.H. 484, 446 A.2d 462 (1982) (high school student entitled to due process in State interscholastic athletic board's determination of his eligibility to compete, even though no fundamental right to participate in school athletics). While parenting an adopted or foster child is not a fundamental right, as parenting one's own biological child is, *Stanley v. Illinois*, 405 U.S. 645, 651–52 (1972), parenting is so ingrained in our culture that to deny the opportunity to adopt or provide foster care is a deprivation of liberty only in a lesser degree. In *Vlandis v. Kline*, 412 U.S. 441 (1973), the United States Supreme Court held that an irrebuttable presumption

touching on a statutory benefit violated due process "when the State has reasonable alternative means of making the crucial determination." *Id.* at 452.

Reasonable alternative methods exist to evaluate the qualifications of homosexuals who apply to adopt or offer foster care. RSA 170-B:14 (Supp. 1986) and RSA 170-E:9 (Supp. 1986), as currently framed, allow ample scope for the investigating agency to deny a homosexual's application to adopt or to offer foster or day care when its investigation reveals that the applicant cannot provide a healthy, caring, nurturing environment for a child. The present division of children and youth services standards state:

> "Foster parent applicants shall be free from physical, mental or emotional illness which, as evidenced in the documentation obtained and the observations made by DCYS, would impair his or her ability to assume and carry out the responsibilities of foster care." N.H. ADMIN. CODE, He-C 6446.03(d)(1). "The physical and mental health of all foster home applicant household members shall not adversely affect the health of the child in care." N.H. ADMIN. CODE, He-C 6446.03(d)(4).

Although neither regulation mentions homosexuality, they are broad enough to permit the division to consider any applicant's sexual conduct in determining the applicant's fitness.

In *Vlandis supra*, the State established its presumption by stipulating one criterion as the sole relevant inquiry regarding present and future residency. Applicants were not denied an opportunity to submit evidence relevant to that criterion, but could not submit evidence on any other point which would in fact be relevant. House Bill 70 has an identical operation. Concededly, the indicia of residency are more objective than are the indicia of parental fitness, but that is no more than a matter of the weight of the evidence in individual determinations. In this vein, the presumed fact that homosexual parents are unfit is no less disprovable than the fact presumed in *Stanley supra* that unwed parents are unfit.

The applicant may be heard, in the first instance, only on the issue of homosexuality, and not on the larger issue of his or her ability to be a good parent, in the best interest of the child. It is this preclusive effect of the bill's irrebuttable presumption that leads me to conclude it would violate both federal and New Hampshire constitutional due process. Therefore, I agree that the bill is unconstitutional as to the day care provisions, but would also hold the bill unconstitutional as to its adoptive and foster parent provisions.

WILLIAM F. BATCHELDER

May 5, 1987

*Devine & Nyquist*, of Manchester (*Maureen E. Raiche* and *Corey Belobrow*), filed a memorandum on behalf of the Majority of the House Committee on Judiciary in opposition to the constitutionality of House Bill 70.

*Charles G. Douglas III*, of Concord, filed a memorandum on behalf of House Bill 70's sponsors in support of the constitutionality of House Bill 70.

*Marcus Hurn* and *Ellen Musinsky*, of Concord, filed a memorandum on behalf of the New Hampshire Civil Liberties Union, the New Hampshire Women's Lobby, the New Hampshire Child Care Association, the New Hampshire Association of Pastoral Counselors, and the New Hampshire Chapter of the National Association of Social Workers in opposition to the constitutionality of House Bill 70.

*Elizabeth Cazden*, of Manchester, filed a memorandum in opposition to the constitutionality of House Bill 70.

*Bruce E. Friedman* and *John MacIntosh*, of Concord, filed a memorandum in opposition to the constitutionality of House Bill 70.

*Gordon J. Humphrey*, United States Senator, filed a memorandum in support of the constitutionality of House Bill 70.

Seven other interested parties submitted materials in support of the constitutionality of House Bill 70.

Thirteen other interested parties submitted materials in opposition to the constitutionality of House Bill 70.