793 So.2d 656 (2001)
S.B., Appellant
v.
L.W., Appellee.
No. 1999-CA-01540-COA.
Court of Appeals of Mississippi.
March 13, 2001.
Rehearing Denied May 22, 2001.
Certiorari Denied September 6, 2001.
Mitchell M. Lundy Jr., Grenada, for Appellant.
*657 Marjorie H. O'Donnell, T. Swayze Alford, Oxford, for Appellee.
EN BANC.
CHANDLER, J., for the Court:
¶ 1. The parties had a child together out of wedlock. After the mother expressed her intent to move from Lafayette County to the Mississippi Gulf Coast, the father petitioned the Lafayette County Chancery Court for a declaration of paternity and for custody of the child. Aggrieved that the chancellor awarded custody to the father, the mother appealed alleging that: (1) the chancellor manifestly erred by applying the law governing child custody in divorce cases rather than applying the law governing custody modifications; and (2) the chancellor erred in granting custody to the father because no material change in circumstances were shown. Finding no error, we affirm.

FACTS
¶ 2. The parties had a sexual relationship which led to the conception of their daughter. While pregnant, the mother moved out of the home she shared with the father to cohabit with a woman. A few hours after the birth of the parties' daughter, the father visited the hospital and signed the child's birth certificate.
¶ 3. During the child's infancy arid early childhood, the mother worked full time as an emergency room nurse. The father worked full time as a paramedic and also held public office. The parties worked opposite shifts, so while the mother was on duty the father cared for the child. The mother acknowledged that she and the father spent equal amounts of time with their daughter during the first four or five years of her life. The father voluntarily paid the mother $100 per month for child support and provided medical insurance for the child. This arrangement was never formalized in court.
¶ 4. In 1994, the mother moved into a house with a woman. The mother testified that she was a bisexual and admitted that her relationship with the woman was intimate. The mother testified that she and her partner did not hold hands or kiss in front of the child; however, the child had seen her mother and her mother's partner share a bed. The mother had discussed her sexual preference with her daughter once, and she admitted that her daughter probably had an idea of the nature of her relationship with her partner. The mother agreed that the lesbian lifestyle was not generally accepted in today's society and stated that she did not believe that her daughter should be raised as a lesbian.
¶ 5. When the child began attending school, she spent more time in her mother's care than in her father's. The parties agreed that their daughter would stay with her father every other weekend. The child also spent a lot of time with her father during the summer and accompanied him and his wife and stepchildren on family vacations. The child has presumably been living with the father since August 17, 1999, the date the custody decree was entered in the court below.
¶ 6. When the mother quit her full time job and expressed her intention to move to Gulfport to start a business, the father petitioned the chancery court for custody of the child. The mother had reduced her working hours from about 40 to 48 per week to approximately 16 per week. The mother testified that initially she would devote a lot of time to starting her business. She had no idea where she, her partner, and her child would live, and also did not know where her daughter would attend school. The mother admitted that a move to Gulfport was not in her daughter's best interest.
*658 ¶ 7. After applying the factors delineated in Albright v. Albright, 437 So.2d 1003 (Miss.1983), the chancellor determined that the child's best interests would be better served in her father's custody. Since custody had never before been judicially determined, the chancellor treated the case as one for initial custody rather than one for modification of custody.
¶ 8. The chancellor held the parties equal on the following Albright factors: child's age, parents' age, child's sex, child's health, and emotional ties between the parents and the child. The chancellor noted that the child spent equal time with both parents until she started school. The chancellor acknowledged that the child lived with her mother once school started, but noted that the father spent ample time with her. While he did not specifically attribute the continuity of care factor to either party, it is clear that the chancellor considered the length of time that the child had spent under each parents' care.
¶ 9. The chancellor ruled that the following factors were in the father's favor: employment, financial stability, stability of environment, and moral fitness. He contrasted the father's employment and financial stability to the mother's. The father worked a full time job and earned $54,000 per year. His household income was more than $100,000. In contrast, the mother reduced her full time hours to part time which gave her enough money to pay her car payment and not much else. The father was financially stable; in contrast, the mother's financial future was uncertain because she planned to move to Gulfport to start a business.
¶ 10. The chancellor also contrasted the stability of the environment that the father would provide to the environment that the mother would provide. He noted that the father would provide a five-bedroom home in which the child would enjoy a private bedroom. Further, the father was married and his wife and stepchildren, with whom the child had close relationships, lived in the home. Thus, the child would be in a stable, traditional, family setting. The chancellor further noted that Lafayette County was noted for its excellent public school system. In contrast, the mother had not yet found a place to live in Gulfport and did not know where the child would attend school. Further, the mother would initially spend a great amount of time in starting the business, time which would take away from the child's care. The chancellor was moved by the mother's admission that it was not in her daughter's best interest to move away from Lafayette County where she had extensive extended family.
¶ 11. The chancellor noted that the mother had been married before and that a son had been born of that marital union. The mother relinquished custody of her son to her ex-husband because she did not feel that she was fit to be a parent. The mother explained that she is fit to be her daughter's custodial parent because she, the mother, has grown up. The chancellor did not consider this explanation sufficient. The chancellor opined that the mother had "a very severe emotional problem."
¶ 12. The chancellor commented on the mother's lesbian lifestyle as it impacted the environmental stability of her home and also as it bore on her moral fitness. The chancellor noted that the mother had two live-in lovers since the child was born. The chancellor also stated that while a lesbian relationship is more acceptable today, it is not the norm. The chancellor acknowledged that he could not base his custody decision solely upon the mother's sexual preference. It was, however, a factor in his decision.

*659 ANALYSIS

I. DID THE CHANCELLOR APPLY THE CORRECT LEGAL STANDARD?
¶ 13. The mother argues that the chancellor should have applied the legal standard used in determining custody modifications rather than the standard used to determine initial custody. Citing Law v. Page, 618 So.2d 96 (Miss.1993), the chancellor held that he was to treat the case as one for initial custody since custody of the child had never been judicially resolved. In Law v. Page, the father of an illegitimate infant boy petitioned the chancery court for a determination of paternity and for custody of the child. The child's mother argued that the chancellor should have applied the standard of law used in custody modification cases and not the standard used in custody determinations incident to divorce. The court rejected the mother's argument, holding:
The "material changes" standard used in modification proceedings is dependent on there being a prior determination of custody. Such is not the case here since there has been no prior custody determination. Therefore the proper standard of law to be applied is that found in divorce proceedings, which is the best interest of the child.
Id. at 101. The court further stated: "[I]n custody dealings involving an illegitimate child, when a father acknowledges the child as his own, the father is deemed on equal footing with the mother as to parental and custodial rights to the child." Id. (citing Smith v. Watson, 425 So.2d 1030 (Miss.1983)).
¶ 14. The chancellor in the case sub judice properly decided the case as one for initial custody, and considered the factors delineated in Albright v. Albright, 437 So.2d 1003 (Miss.1983). This assignment of error is without merit.

II. DID THE CHANCELLOR ERR IN AWARDING CUSTODY TO THE FATHER?
¶ 15. This Court does not have the authority to reverse a chancellor's custody determination unless the chancellor is manifestly wrong, clearly erroneous, or applies an erroneous legal standard. Weigand v. Houghton, 730 So.2d 581 (¶ 14) (Miss.1999). We have already held that the chancellor analyzed this case under the correct legal standard. We must now determine whether the chancellor's custody determination was manifestly wrong or clearly erroneous. The mother expressed particular concern that the chancellor gave undue consideration to her impending move to Gulfport and to her homosexual lifestyle without finding that the child had been adversely affected. We find that the chancellor was not manifestly wrong and did not clearly err by awarding custody to the father for the following reasons.

A. The move
¶ 16. The mother argues that the chancellor placed undue emphasis on her impending move to Gulfport in awarding primary custody to the father. She cites case law in which the supreme court has held that moving to a different geographical location does not constitute a material change in circumstances. Citation to these cases is flawed because custody had never been judicially determined; thus, the chancellor was not required to find a material change in circumstances, or adverse impact upon the child, before he could consider the move in his custody determination.
¶ 17. Further, the supreme court has considered it a valid exercise of a chancellor's discretion to consider that a child has more friends and relatives in a particular location when determining the custody of a *660 child. Sobieske v. Preslar, 755 So.2d 410, 413 (Miss.2000). In Sobieske, the parents held joint custody of the child. The mother remarried and was moving to Atlanta. As a result, the mother filed for primary custody and the father filed a countercomplaint. Id. The chancellor gave substantial weight to the move and the supreme court found no error.

B. Homosexuality
¶ 18. The mother also argues that the chancellor gave undue consideration to her bisexual lifestyle in awarding custody to the father. The dissent points out that under Mississippi law sexual relations of an unmarried custodial parent cannot be the sole factor in determination of custody absent a finding that the relationship caused harm to the child. Forsythe v. Akers, 768 So.2d 943 (Miss.Ct.App.2000). Quite so. But just as clearly and frequently the supreme court has stated that it can be one factor. See Sullivan v. Stringer, 736 So.2d 514, 517-18 (Miss.Ct.App.1999). "What we are left with is that the existence of the relationship is insufficient, but if the relationship is coupled with other conduct that indicates the custodial parent's behavior is harmful in additional ways, custody can be changed." Id. at (¶ 20). Of course, the present case is an initial custody determination, not a custody modification.
¶ 19. The particular issue of whether a chancellor may consider a parent's homosexuality in making his custody determination has been considered by the Mississippi Supreme Court. In Weigand v. Houghton, 730 So.2d 581 (Miss.1999), the father petitioned the chancery court for modification of a child custody order changing physical custody of his son from his ex-wife. The impetus for the father's petition stemmed from the son's witnessing two acts of violence that his stepfather had inflicted upon his mother. The first occasion of violence resulted in the son's stepfather's conviction for simple assault. The second occasion resulted in the stepfather's conviction for public drunkenness and malicious mischief. While the stepfather never abused the child physically, he threatened to kill the child during the second disturbance. The son then told his father that he wanted to live with him.
¶ 20. The chancellor analyzed, under Albright, whether a change of custody was in the child's best interest. He declined to remove the child from his mother's custody. The chancellor seemed most concerned with the father's moral fitness. The father is a homosexual involved in a monogamous relationship with his lifepartner of eight years. While the child loved his father, he did not approve of his father's lifestyle, and he expressed embarrassment when his father appeared in public with his partner. Noting that the morality of the father's lifestyle was one important factor to consider, the chancellor stated that this was not the sole basis for his decision to leave custody with the mother.
¶ 21. The supreme court noted that the father's moral fitness caused the greatest concern with the chancellor. However, the court stated that: "Although the morality of [the father's] lifestyle was one important factor to consider in the eyes of the chancellor, this was not the sole basis for his custody decision." Id. at (¶ 22). The court affirmed the chancellor's custody finding, stating: "On this record, this Court cannot say that the chancellor was manifestly wrong in denying [the father's] petition for modification to change child custody...." Id. at (¶ 24).
¶ 22. The Weigand court clearly condoned the chancellor's consideration of the father's homosexuality in considering his fitness to be a custodial parent, but carefully *661 noted that this was not the sole basis for the chancellor's decision. Like the chancellor in Weigand, the chancellor in the present case was greatly concerned with the mother's bisexual lifestyle; however, this was not the sole basis for his decision.
¶ 23. In White v. Thompson, 569 So.2d 1181 (Miss.1990), the court considered a case in which custody was awarded to the child's grandparents and not to the lesbian mother. The mother argued that her lesbian conduct was not shown to have had any detrimental effect on her children. The supreme court, however, affirmed the custody award. The court stated:
Though the predominant issue in this case seems to have been [the mother's] lesbian relationship, and the chancellor may have relied almost entirely on this, we find that a review of the entire record and the circumstances present, including the children's health and supervision and the atmosphere in which they were being brought up shows that the chancellor's decision that [the mother] was an unfit mother, morally and otherwise, was not against the overwhelming weight of the evidence.
Id. at 1184.
¶ 24. The White case demonstrates that even though the mother's lesbian lifestyle seemed to be the predominate issue in the chancellor's mind, this Court is not at liberty to reverse if the other Albright factors support an award to the non-homosexual parent.
¶ 25. The dissent believes that the homosexuality of a parent should not be a factor in custody determinations. It cites a long list of cases from other jurisdictions that it apparently believes reflects the more thoughtful view of the irrelevance of homosexual relations when determining custody of a child. We note that the list was taken from the dissent in White v. Thompson, 569 So.2d at 1185-86. Most of these cases uphold our view that homosexuality can be one but not the sole basis for child custody. We have found no case law that states homosexuality or the sexual behavior of a parent must be ignored.
¶ 26. In the present case, in addition to the mother's bisexual lifestyle, the chancellor was disturbed at the mother's lack of financial and emotional stability. He was extremely concerned that the mother quit a well-paying full time job to move to Gulfport to start a business. The chancellor was most impressed with the father's ability to provide a stable environment for his daughter in the form of an established home in which she would have her own bedroom and would be living in a traditional family environment. As in Weigand and Thompson, although the morality of the mother's lifestyle was one important factor to the chancellor's decision, it was not the sole factor; thus, there was no clear error and the chancellor did not abuse his discretion in awarding custody to the father.
¶ 27. THE JUDGMENT OF THE LAFAYETTE COUNTY CHANCERY COURT GRANTING CUSTODY OF THE CHILD TO APPELLEE IS AFFIRMED. COSTS OF THE APPEAL ARE ASSESSED TO THE APPELLANT.
McMILLIN, C.J., SOUTHWICK, P.J., PAYNE, BRIDGES, LEE, IRVING and MYERS, JJ., concur.
PAYNE, J., concurs with separate written opinion joined by SOUTHWICK, P.J.
THOMAS, J., dissents with separate written opinion joined by KING, P.J.
*662 PAYNE, J., concurring:
¶ 28. While I do agree with the majority, I write separately because I feel the dissent has delved into an area where our State legislature has made clear its public policy position relating to particular rights of homosexuals in domestic relations settings. In my review of statutory authority, I find that in 2000 the legislature added an amendment to Miss.Code Ann. § 93-17-3 (Supp.2000) which reads, "(2) Adoption by couples of the same gender is prohibited." This statute is brand new and has not yet been challenged in our appellate courts. Another statute which shows the legislature's intention concerning homosexuals and family relations is Miss.Code Ann. § 93-1-1(2) (Supp.2000). A 1997 amendment to that statute added the sub-section which reads, "Any marriage between persons of the same gender is prohibited and null and void from the beginning. Any marriage between persons of the same gender that is valid in another jurisdiction does not constitute a legal or valid marriage in Mississippi." Additionally, Miss.Code Ann. § 97-29-59 (Rev.2000) states, "Every person who shall be convicted of the detestable and abominable crime against nature committed with mankind or with a beast, shall be punished by imprisonment in the penitentiary for a term of not more than ten years." That statute has been held to apply to homosexual acts. See Miller v. State, 636 So.2d 391 (Miss.1994); Haymond v. State, 478 So.2d 297 (Miss.1985); State v. Mays, 329 So.2d 65 (Miss.1976). Looking to these cited authorities and to the United Stated Supreme Court case of Bowers v. Hardwick, 478 U.S. 186, 106 S.Ct. 2841, 92 L.Ed.2d 140 (1986), which upheld the constitutionality of a Georgia sodomy statute, I find that the legislature has clearly set forth the public policy of our State with regard to the practice of homosexuality.
¶ 29. The dissent cites to other jurisdictions which permit same-sex adoptions, which is contrary to the policy of our State. However, I find that Mississippi is not alone in its policy of declining to recognize homosexual relationships in the context of domestic matters. See Karla J. Starr, Adoption by Homosexuals: A Look at Differing State Court Opinions, 40 Ariz. L.Rev. 1497 (1998).
¶ 30. In Florida, a 1977 statute which has gone relatively unchallenged today reads, "No person eligible to adopt under this statute may adopt if that person is a homosexual." Fl. St. Ann. § 63.042(3). This statute was debated in the Florida Supreme Court case of State, Department of Health and Rehabilitative Services v. Cox, 627 So.2d 1210 (Fla.Ct.App.1993). The Florida Supreme Court remanded for further information on the equal protection issue, but said in its opinion:
Moreover, adoption is simply not a private matter. As the trial court recognized, adoption is not a right; it is a statutory privilege. Thus, adopting a child is not the same as choosing to have a natural family. We recognize that certain fundamental constitutional rights are involved in an established parent/child relationship. A person who asks the state for the privilege to adopt does not have a fundamental right arising from an existing family relationship. Instead, the applicant asks the state to make a decision in the best interests of a child in need of adoption.
Cox, 627 So.2d at 1216 (citations omitted).
¶ 31. The New Hampshire courts and legislature have also taken strides to limit rights of homosexual couples in domestic situations. In 1987, the New Hampshire legislature asked the supreme court of that state to provide them with an advisory memorandum concerning whether any constitutional problem existed with certain *663 proposed legislation. The proposed legislative bill in question prohibited homosexual persons from becoming foster parents, from operating day care centers and from becoming adoptive parents. The New Hampshire Supreme Court concluded that such law did not violate U.S. or New Hampshire constitutional safeguards protecting equal protection, due process, right to privacy or freedom of association.
[T]he general court has chosen over the years to enact statutes relative to adopting children, providing foster care, and licensing day care centers in order to further the best interests of our state's children. These statutory enactments of the state do not involve intrusion into the private lives of consenting adults, but rather further the public and governmental interest in providing for the health, safety, and proper training for children who will be the subject of governmentally approved or licensed activities relating to such children. The general court finds that, as a matter of public policy, the provision of a healthy environment and a role model for our children should exclude homosexuals, as defined by this act, from participating in governmentally sanctioned programs of adoption, foster care, and day care. Additionally, the general court finds that being a child in such programs is difficult enough without the added social and psychological complexities that a homosexual lifestyle could produce. The general court makes this statement in a deliberative and balanced manner both recognizing the rights of consenting adults, as limited by the Supreme Court of the United States in Bowers v. Hardwick, 478 U.S. 186, 106 S.Ct. 2841, 92 L.Ed.2d 140 (1986), and the rights of the children of this state, who are intimately affected by the policies of this state in the above governmentally sanctioned programs, to positive nurturing and a healthy environment for their formative years....
In re Opinion of the Justices, 129 N.H. 290, 530 A.2d 21 (1987).
¶ 32. Even beyond these other states that explicitly forbid same-sex couples from adopting children who do not biologically belong to either person, other states have declined to permit homosexuals from even adopting their partner's biological child. This practice is often referred to as "second-parent adoptions." See In re Adoption of T.K.J. & K.A.K., 931 P.2d 488 (Colo.Ct.App.1996); In re Adoption of C.C.G. and Z.C.G., 762 A.2d 724 (Pa.Super.2000); In Interest of Angel Lace M., 184 Wis.2d 492, 516 N.W.2d 678 (1994).
¶ 33. I do recognize that any adult may choose any activity in which to engage; however, I also am aware that such person is not thereby relieved of the consequences of his or her choice. It is a basic tenet that an individual's exercise of freedom will not also provide an escape of the consequences flowing from the free exercise of such a choice. As with the present situation, the mother may view her decision to participate in a homosexual relationship as an exertion of her perceived right to do so. However, her choice is of significant consequence, as described before in the discussion of our State's policies, in that her rights to custody of her child may be significantly impacted.
¶ 34. Under the principles of Federalism, each state is permitted to set forth its own public policy guidelines through legislative enactments and through judicial renderings. Our State has spoken on its position regarding rights of homosexuals in domestic situations. Coupling the legislature's unambiguous rules with our established case law rules, I agree that we should not find that the chancellor erred in considering the homosexual lifestyle of one *664 of the parents in this case as a factor in determining suitability for custody.
¶ 35. All of the Albright factors go to protect the best interests of the child. Since this State has clearly enunciated its policy in this area, I find no room remains for exception when considering whether or not to apply such policy in an applicable situation.
¶ 36. "When this Court reviews the decision of a chancellor relative to child custody we will not disturb that decision unless the chancellor was manifestly wrong, clearly erroneous, or applied an erroneous legal standard." Limbaugh v. Limbaugh, 749 So.2d 1244 (¶ 9) (Miss.Ct.App.1999). In this case, the chancellor properly considered the Albright factors, including our State's public policy issue regarding homosexuality, in making his decision. Even barring the whole sexual preference discussion, I would agree with the majority that ample evidence existed to support the chancellor's decision.
SOUTHWICK, P.J., joins this separate written opinion.
THOMAS, J., dissenting:
¶ 37. With all due respect to the majority, I dissent. The majority opinion is based on three crucial errors in child custody law, being:
1. The mother, S.B., and the father, L.W., shared joint custody of their illegitimate child for the first five years of the child's lifetime;
2. The possibility or occurrence of a parent's relocation to another city is a factor to be considered in granting child custody; and
3. The sexual preference of the natural mother is a factor to be considered in granting child custody. These assertions are erroneous. Rather, the following analysis is supported by Mississippi law:
1. The mother of an illegitimate child is the only person with a legal right to custody of the child;
2. The possibility or occurrence of a parents relocation to another city is a factor that not only should not be considered in granting custody, is unconstitutional;
3. The sexual indiscretions or preference of a parent is a factor that should not be considered in granting custody of a child unless it is shown that such was harmful to the child.
¶ 38. The majority relies on the fact that S.B. admitted that both she and L.W. shared joint custody of P.A.W. until P.A.W. was old enough to begin school (five years old), at which time L.W. continued to enjoy liberal visitation rights. However, the majority overlooks the fact that L.W. had absolutely no legal right to custody of the child until he filed a petition for custody, eight years after the child's birth. Mississippi recognizes the old common law rule that "the putative father of an illegitimate child is entitled to the custody of the child as against all but the mother. If the mother be dead, and the father a suitable person, it shall be taken from the maternal grandparents and delivered to him." Aycock v. Hampton, 84 Miss. 204, 36 So. 245, 245-6 (1904) (citing Commonwealth v. Anderson, 1 Ashm. 55 (1831)). See also Smith v. Watson, 425 So.2d 1030, 1032-3 (Miss.1983); Pearson v. Clark, 382 So.2d 482, 483-4 (Miss.1980); Illinois Cent. R. Co. v. Sanders, 104 Miss. 257, 61 So. 309, 310 (1913); Hibbette v. Baines, 78 Miss. 695, 29 So. 80 (1900); American Digest (Century Edition) vol. 6, p. 1835, § 19. The mother had sole legal right to the child regardless of any mutually agreeable visitation rights that the father enjoyed. It was purely gratuitous of S.B., the mother, to grant such visits to L.W., rather than by legal right. Therefore, *665 regardless of her factual admission during trial that L.W. and S.B. shared custody of the child, legally such did not exist until paternity was established in the trial proceedings at hand.
¶ 39. It should be noted that but for S.B.'s agreement to the stipulation that L.W. was the natural father of P.A.W., L.W.'s petition for determination of paternity, and, thus, L.W.'s petition for an award of custody and child support would be procedurally barred due to the fact that the statute of limitation (three years) had passed several years before. Johnson v. Ladner, 563 So.2d 1368, 1369 (Miss.1990). However, S.B. did not raise this issue at trial.
¶ 40. It should also be noted that while L.W. voluntarily supported the child and had liberal visitation rights up to the point of the chancellor's decision, the natural father of an illegitimate child is, in any event, required by law to support his child. Miss.Code Ann. § 93-9-7; § 93-9-9(1); § 97-5-3.
¶ 41. Law v. Page, 618 So.2d 96, 101-2 (Miss.1993), was the focal authority cited by the chancellor in the decision granting L.W. custody of P.A.W. The chancellor correctly cited Law v. Page as authority in applying the Albright analysis to decide a custody dispute between the parents of an illegitimate child rather than applying factors as if this were a modification of custody proceeding. However, the chancellor overlooked the portion of the decision where the Mississippi Supreme Court considered how long the child had been living with the father.
¶ 42. In Law v. Page, the custody dispute began when the infant child was younger than a year old. The mother was found to be unfit and the father was granted custody. By the time the Mississippi Supreme Court affirmed, the child had been in the father's custody for more than three years. The Mississippi Supreme Court stated in their opinion that it was in the child's best interest to remain in Page's custody due to the fact that Page had cared for the child for the last three years of his life, the child had become a stable member of the father's family.
¶ 43. Quite to the contrary, in the case at hand, the chancellor gave no weight to the fact that the child had been living with S.B. for the last eight years. It seems that the chancellor ignored the essential factor of time and the stability of P.A.W.'s familial relationship in this case. Rather, the chancellor focused on, and gave great weight to, the facts that S.B. was planning to relocate and that she was a lesbian. We quote the chancellor's record extensively:
We've got a case in Mississippi Albright v. Albright. I know the lawyers are well familiar with it. You've got your Albright factors. I've got it here before me with a checklist.
The age of the child is of concern. [P.A.W.] is a eight-year-old, this next April will be nine. In just a few more years she will be a teenager. She's a young lady. She's not what you would call a babe in arms now, to me she is still a child. I don't think that either parent would have an upper hand because of the age of the child, so I've given both parents a check mark.
The sex of the child. I've given both parents a check mark there. When I started practicing law, 30 some odd years ago, the sex of the child was the very basis for determining custody. Now, then, that is a very minor part of custody, unless it's just an absolute effort.
And, then, you've got the continuity of care prior to separation. Here both parents, until the child started school, shared equally in that. And I would *666 gauge them both about equal on that, other than the mother has had more care since the child has started school, because the child has spent more time with her. But the father has also spent a lot of time with her.
The best parenting skills. I think both of them are pretty good parents. I think that the only drawback, I think [S.B.] has some emotional problems. I think she needs to get her feet on the ground. She's quit her job in hopes of opening a business, rather than continuing with a job until she knows that she is going to open a business is a very immature decision as far as the Court is concerned. When I questioned her about that she said that she had enough money coming in now to make the automobile payments and payments. When I questioned her as to who would support the child she said she would and [R.A.]. She's not [R.A.]'s child. It's not her duty to support this child. I would give both parents a check mark there.
Employment factors. This will go to [L.W.]. He's stable in his employment. He and his wife have a combined income of over $100,000 a year. He's been at this job for a long time. [S.B.] has quit her job. She's got two part-time jobs, so I would give that check to [L.W.].
The age of the parents. They are in 30's-40's, late 30's, I give both parents there a check mark.
The health of the child. The physical health of the child and physical health of the parent, I give a check mark to both of them there.
Mental health of the parent. I think [L.W.] would get a check mark there. I think he appears to be the more stable of the two.
Emotional ties between the parent and child. I think it's even in this case.
The moral fitness of the parent. I would have to give that check to [L.W.]. [S.B.] has had two lovers since this child has been born. She's had Chris and she's had [R.A.]. Tomorrow she could possibly have somebody else. The relationship that she is in in today's society is being more accepted but it's still not the norm. So I give that check mark to the father, [L.W.].
Stability of the home environment. It would have to go to [L.W.] because he is in a heterosexual environment. Has a home there that is an average American home. It's stable. The stability in the home [S.B.] is in is not that stable.
Those are not the only criteria that this Court has got to look at in a situation like this. There's other criteria that I think is of great importance in deciding the serious question of custody. One is the parties present and future financial condition. It appears that the [L.W.]'s have a stable financial condition. They are healthy. [S.B.] and her partner are considering on opening a new business venture in Gulfport, Mississippi, which could be successful or could be a disaster. So their future financial condition is unknown.
The general and specific environment in which the children or child would be reared. To place the child with [S.B.], the child would be reared in a lesbian home, which is not the common home of today. To place a child with [L.W.], the child would be reared in a home which is considered more common today. She would be in a home of a mother, father, stepbrothers and sisters, which this Court-the testimony before the Court today is a very stable home, and it's a very loving home.
And you've got to consider the character of the public schools. The schools and churches that they attend. I don't *667 know anything about the Gulfport school system, I'm sure that it's a good school system, none of this was brought out by any of the testimony today. But it's common knowledge about the school systems in Lafayette County, Mississippi-their rating. Oxford is rated five and Lafayette has always rated four. Five is as high as you can be, fourth is next. We are fortunate in this locate that we have such excellent school systems.
General environment and conditions of the neighborhood in which the child will reside. If the child resides with either parent here in Lafayette County, Mississippi, from the testimony before the Court, it will be residing in the rural part of the county. One on the eastern part and one that lives on the western part. If [S.B.] and them go ahead with their plan to move to Gulfport, Mississippi, I don't know what type of neighborhood that they will be residing in.
The health and attitude of the persons who own the home in which the child is to live. In this situation the [W.]'s, that would be Mr. and Mrs. [L.W.] own the home. In the other situation [S.B.], it would be [R.A.] owning the home. Mr. and Mrs. [L.W.] are married and [R.A.] and [S.B.] have a lesbian relationship.
This Court has got to do what this Court thinks is right for the best interests of this child now and in the future. Based upon the evidence that's before the Court, and the law as it now stands in the state of Mississippi, I feel that the best interest of the child would be to place her with her father, [L.W.], and I so order.
¶ 44. The Mississippi Supreme Court has held "that our courts may not require that children be reared in a single community." Bell v. Bell, 572 So.2d 841, 847 (Miss.1990). See also Ayers v. Ayers, 734 So.2d 213, 217 (Miss.Ct.App.1999). It has been specifically explained that in a divorce proceeding, a chancellor cannot decree that a child remain in a certain community. Bell, 572 So.2d at 847; Ayers, 734 So.2d at 217. Our supreme court has further held that the fact that "a parent moves is certainly not per se a material change of circumstances" warranting modification of custody. Spain v. Holland, 483 So.2d 318, 320 (Miss.1986). See also Stevison v. Woods, 560 So.2d 176 (Miss.1990); Pearson v. Pearson, 458 So.2d 711 (Miss. 1984). The Mississippi Supreme Court has also appropriately noted that the right to relocate is incorporated in the fundamental right to travel, which is protected by the United States Constitution. See Attorney General of New York v. Soto-Lopez, 476 U.S. 898, 902-03, 106 S.Ct. 2317, 90 L.Ed.2d 899 (1986); Zobel v. Williams, 457 U.S. 55, 102 S.Ct. 2309, 72 L.Ed.2d 672 (1982); Edwards v. California, 314 U.S. 160, 183, 62 S.Ct. 164, 86 L.Ed. 119 (1941).
¶ 45. Further, our supreme court stated that:
We regard it presumptuous for anyone, court or otherwise, to declare as an absolute that it is in the best interest of a young boy or girl that he or she spend his or her entire minority in a single community. We regard it particular folly to decree in advanceat a time when one child may be twelve and another sixthat it will be in their best interest to remain in a given community until they become adults. This is simply something that no individual and certainly no court can know.
Bell, 572 So.2d at 847. Therefore, the fact that a parent will or may relocate to another community should not be considered in a custody dispute absent a finding of adverse impact on the child.
¶ 46. Our appellate courts have firmly established that an application of the Albright *668 analysis cannot be based upon sexual relations of the unmarried custodial parent, absent a finding of some conduct harmful in a more specific sense than the certain knowledge of such a relationship. Sullivan v. Stringer, 736 So.2d 514, 517-8 (Miss.Ct.App.1999); McAdory v. McAdory, 608 So.2d 695, 702 (Miss.1992); Carr v. Carr, 480 So.2d 1120, 1121 (Miss.1985); Kavanaugh v. Carraway, 435 So.2d 697, 700 (Miss.1983); Cheek v. Ricker, 431 So.2d 1139, 1144-5 (Miss.1983), Yates v. Yates, 284 So.2d 46, 48 (Miss.1973); Anderson v. Watkins, 208 So.2d 573, 574 (Miss.1968); Rushing, 724 So.2d at 916; Moak v. Moak, 631 So.2d 196, 198 (Miss. 1994). See also Amis, Divorce and Separation in Mississippi's 214 (1935), and 24 Am.Jur.2d Divorce and Separation § 788 (1966). It must be proven that such conduct adversely affected the child. Forsythe v. Akers, 768 So.2d 943, 947 (Miss.Ct. App.2000).
¶ 47. The crucial Albright decision itself established that just as marital fault, relative financial situations, differences in religion, personal lifestyles and personal values should not be used as sanctions or be the sole basis for an initial custody decision, such factors should not be the sole cause of a modification of custody order. Albright, 437 So.2d at 1005. See also Rushing, 724 So.2d at 916 (citing Moak, 631 So.2d at 198). Nor should a parent be punished for their personal lifestyles or sexual behavior. Smith v. Jones, 654 So.2d 480, 487 (Miss.1995)(quoting Tucker v. Tucker, 453 So.2d 1294, 1297 (Miss. 1984)); Moak, 631 So.2d at 200; Crowson v. Moseley, 480 So.2d 1150, 1152 (Miss. 1985). Yet, the chancellor below repeatedly alludes to the fact that S.W. is a lesbian.
¶ 48. As to the assertion that S.B.'s lesbian lifestyle provides an immoral and unfit home for a child, it is the modern trend across the United States of America to reject legal rules that deny homosexual parents the fundamental constitutional right to parent a child. See S.N.E. v. R.L.B., 699 P.2d 875 (Alaska 1985); In re Marriage of Birdsall, 197 Cal.App.3d 1024, 1028, 243 Cal.Rptr. 287, 289 (1988); Nadler v. Superior Court, 255 Cal.App.2d 523, 525, 63 Cal.Rptr. 352, 354 (1967); D.H. v. J.H., 418 N.E.2d 286, 293 (Ind.Ct.App. 1981); Doe v. Doe, 16 Mass.App.Ct. 499, 503, 452 N.E.2d 293, 296 (1983); In re J.S. & C., 129 N.J.Super. 486, 489, 324 A.2d 90, 92 (Ch.Div.1974), aff'd, 142 N.J.Super. 499, 362 A.2d 54 (1976); Guinan v. Guinan, 102 A.D.2d 963, 964, 477 N.Y.S.2d 830, 831 (1984); Conkel v. Conkel, 31 Ohio App.3d 169, 509 N.E.2d 983, 985 (1987); see also In re Adoption of Charles B., 50 Ohio St.3d 88, 552 N.E.2d 884, 888 (1990) (homosexuality of father not per se grounds for denial of adoption); A. v. A., 15 Or. App. 353, 514 P.2d 358, 360 (1973); Constant A. v. Paul C.A., 344 Pa.Super. 49, 496 A.2d 1, 9 (1985); Stroman v. Williams, 291 S.C. 376, 379-80, 353 S.E.2d 704, 705-06 (Ct.App.1987); Kallas v. Kallas, 614 P.2d 641, 645 (Utah 1980); Medeiros v. Medeiros, 8 Fam.L.Rep. (BNA) 2372 (Vt.Super.Ct.1982); In re Marriage of Cabalquinto, 100 Wash.2d 325, 329, 669 P.2d 886, 888 (1983); Rowsey v. Rowsey, 174 W.Va. 692, 329 S.E.2d 57, 60-61 (1985); see also In re Jacinta M., 107 N.M. 769, 764 P.2d 1327 (Ct.App.1988) (dictum) (stating that the homosexuality of the child's brother was not sufficient alone to deny him custody); M.A.B. v. R.B., 134 Misc.2d 317, 510 N.Y.S.2d 960 (1986) (discussion of unsubstantiated societal biases associated with custody actions wherein homosexuals are parties, as well as the possible beneficial aspects of granting such custody in certain instances).
¶ 49. Although our supreme court has not specifically addressed the issue of granting a lesbian custody in initial custody proceedings or modification proceedings, *669 its pronouncements regarding heterosexual relations of unmarried parents coupled with the wealth of authority from other jurisdictions leads me to the inescapable conclusion that the issue has no bearing absent a conclusion that such has or will have an adverse impact on the child.
¶ 50. Because the chancellor considered two factors, sexual preference and change of residence, without addressing any adverse impact upon the child and, likewise, did not factor in the length of time the child had been in the custody of its mother, this case should be reversed and remanded for reconsideration.
¶ 51. The chancellor, of course, should be free to receive any other evidence he wishes on remand, particularly given the time span since this matter was first heard.
KING, P.J., joins this separate written opinion.