PAYNE, J.,
concurring:
¶ 28. While I do agree with the majority, I write separately because I feel the dissent has delved into an area where our State legislature has made clear its public policy position relating to particular rights of homosexuals in domestic relations settings. In my review of statutory authority, I find that in 2000 the legislature added an amendment to Miss.Code Ann. § 93-17-3 (Supp.2000) which reads, “(2) Adoption by couples of the same gender is prohibited.” This statute is brand new and has not yet been challenged in our appellate courts. Another statute which shows the legislature’s intention concerning homosexuals and family relations is Miss.Code Ann. § 93-1-1(2) (Supp.2000). A 1997 amendment to that statute added the sub-section which reads, “Any marriage between persons of the same gender is prohibited and null and void from the beginning. Any marriage between persons of the same gender that is valid in another jurisdiction does not constitute a legal or valid marriage in Mississippi.” Additionally, Miss.Code Ann. § 97-29-59 (Rev.2000) states, “Every person who shall be convicted of the detestable and abominable crime against nature committed with mankind or with a beast, shall be punished by imprisonment in the penitentiary for a term of not more than ten years.” That statute has been held to apply to homosexual acts. See Miller v. State, 636 So.2d 391 (Miss.1994); Haymond v. State, 478 So.2d 297 (Miss.1985); State v. Mays, 329 So.2d 65 (Miss.1976). Looking to these cited authorities and to the United Stated Supreme Court case of Bowers v. Hardwick, 478 U.S. 186, 106 S.Ct. 2841, 92 L.Ed.2d 140 (1986), which upheld the constitutionality of a Georgia sodomy statute, I find that the legislature has clearly set forth the public policy of our State with regard to the practice of homosexuality.
¶ 29. The dissent cites to other jurisdictions which permit same-sex adoptions, which is contrary to the policy of our State. However, I find that Mississippi is not alone in its policy of declining to recognize homosexual relationships in the context of domestic matters. See Karla J. Starr, Adoption by Homosexuals: A Look at Differing State Court Opinions, 40 Ariz. L.Rev. 1497 (1998).
¶ 30. In Florida, a 1977 statute which has gone relatively unchallenged today reads, “No person eligible to adopt under this statute may adopt if that person is a homosexual.” FI. St. Ann. § 63.042(3). This statute was debated in the Florida Supreme Court case of State, Department of Health and Rehabilitative Services v. Cox, 627 So.2d 1210 (Fla.Ct.App.1993). The Florida Supreme Court remanded for further information on the equal protection issue, but said in its opinion:
Moreover, adoption is simply not a private matter. As the trial court recognized, adoption is not a right; it is a statutory privilege. Thus, adopting a child is not the same as choosing to have a natural family. We recognize that certain fundamental constitutional rights are involved in an established parent/child relationship. A person who asks the state for the privilege to adopt does not have a fundamental right arising from an existing family relationship. Instead, the applicant asks the state to make a decision in the best interests of a child in need of adoption.
Cox, 627 So.2d at 1216 (citations omitted).
¶ 31. The New Hampshire courts and legislature have also taken strides to limit rights of homosexual couples in domestic situations. In 1987, the New Hampshire legislature asked the supreme court of that state to provide them with an advisory memorandum concerning whether any constitutional problem existed with certain *663 proposed legislation. The proposed legislative bill in question prohibited homosexual persons from becoming foster parents, from operating day care centers and from becoming adoptive parents. The New Hampshire Supreme Court concluded that such law did not violate U.S. or New Hampshire constitutional safeguards protecting equal protection, due process, right to privacy or freedom of association.
[T]he general court has chosen over the years to enact statutes relative to adopting children, providing foster care, and licensing day care centers in order to further the best interests of our state’s children. These statutory enactments of the state do not involve intrusion into the private lives of consenting adults, but rather further the public and governmental interest in providing for the health, safety, and proper training for children who will be the subject of gov-ernmentally approved or licensed activities relating to such children. The general court finds that, as a matter of public policy, the provision of a healthy environment and a role model for our children should exclude homosexuals, as defined by this act, from participating in governmentally sanctioned programs of adoption, foster care, and day care. Additionally, the general court finds that being a child in such programs is difficult enough without the added social and psychological complexities that a homosexual lifestyle could produce. The general court makes this statement in a deliberative and balanced manner both recognizing the rights of consenting adults, as limited by the Supreme Court of the United States in Bowers v. Hardwick, 478 U.S. 186, 106 S.Ct. 2841, 92 L.Ed.2d 140 (1986), and the rights of the children of this state, who are intimately affected by the policies of this state in the above governmentally sanctioned programs, to positive nurturing and a healthy environment for their formative years....
In re Opinion of the Justices, 129 N.H. 290, 530 A.2d 21 (1987).
¶32. Even beyond these other states that explicitly forbid same-sex couples from adopting children who do not biologically belong to either person, other states have declined to permit homosexuals from even adopting their partner’s biological child. This practice is often referred to as “second-parent adoptions.” See In re Adoption of T.K.J. & K.A.K., 931 P.2d 488 (Colo.Ct.App.1996); In re Adoption of C.C.G. and Z.C.G., 762 A.2d 724 (Pa.Super.2000); In Interest of Angel Lace M., 184 Wis.2d 492, 516 N.W.2d 678 (1994).
¶ 33. I do recognize that any adult may choose any activity in which to engage; however, I also am aware that such person is not thereby relieved of the consequences of his or her choice. It is a basic tenet that an individual’s exercise of freedom will not also provide an escape of the consequences flowing from the free exercise of such a choice. As with the present situation, the mother may view her decision to participate in a homosexual relationship as an exertion of her perceived right to do so. However, her choice is of significant consequence, as described before in the discussion of our State’s policies, in that her rights to custody of her child may be significantly impacted.
¶ 34. Under the principles of Federalism, each state is permitted to set forth its own public policy guidelines through legislative enactments and through judicial renderings. Our State has spoken on its position regarding rights of homosexuals in domestic situations. Coupling the legislature’s unambiguous rules with our established case law rules, I agree that we should not find that the chancellor erred in considering the homosexual lifestyle of one *664 of the parents in this case as a factor in determining suitability for custody.
¶ 35. All of the Albright factors go to protect the best interests of the child. Since this State has clearly enunciated its policy in this area, I find no room remains for exception when considering whether or not to apply such policy in an applicable situation.
¶ 36. “When this Court reviews the decision of a chancellor relative to child custody we will not disturb that decision unless the chancellor was manifestly wrong, clearly erroneous, or applied an erroneous legal standard.” Limbaugh v. Limbaugh, 749 So.2d 1244 (¶ 9) (Miss.Ct.App.1999). In this case, the chancellor properly considered the Albright factors, including our State’s public policy issue regarding homosexuality, in making his decision. Even barring the whole sexual preference discussion, I would agree with the majority that ample evidence existed to support the chancellor’s decision.
SOUTHWICK, P.J., joins this separate written opinion.